[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14908

_____

D. C. Docket No. 00-02919-CV-CLS-RRA

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 8, 2010
JOHN LEY
ACTING CLERK

WILLIAM GLENN BOYD,

Petitioner-Appellee,
Cross-Appellant,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Department of Corrections,
THE ATTORNEY GENERAL OF STATE OF ALABAMA,

Respondents-Appellants,
Cross-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 8, 2010)

Before BIRCH, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, the Commissioner of the Alabama Department of

Corrections, Richard F. Allen, appeals from the district court's order granting in

part William Glenn Boyd's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. The district court granted relief on Boyd's claim that his trial counsel were constitutionally ineffective during the penalty phase of the trial, holding that trial counsel performed deficiently when they failed to conduct a reasonable investigation of mitigating evidence, particularly concerning his childhood, and, thereafter, failed to present this evidence to the jury and the sentencing judge. Boyd, in turn, cross-appeals from the district court's rejection of three additional claims: first, that some of the jurors impermissibly considered extra-judicial evidence during their deliberations; second, that the State knew its key witness had perjured himself; and, finally, that his trial counsel rendered ineffective assistance by failing to adequately challenge the testimony offered by a co-conspirator, and failed to seek expert assistance.

After thorough review, we affirm in part and reverse in part. Applying the law to the record before us, we conclude that there is no reasonable probability the performance of Boyd's counsel, even if deficient, prejudiced the outcome of the penalty phase of his trial. Moreover, we can discern no merit in Boyd's cross-appeal. Accordingly, we reverse the district court's order granting habeas relief, and remand with instructions to reinstate Boyd's original sentence.

## I. Facts and Procedural History

2

**A.     The Guilt Phase of the Trial**

The brutal facts surrounding the kidnaping, robbery, and murder of Fred and Evelyn Blackmon are these. The Blackmons disappeared from their home in Anniston, Alabama, on March 26, 1986. Between 9:30 and 10:00 a.m. that morning, Mr. Blackmon, accompanied by a slender white male with long dark hair, cashed a $5,000 check at the drive-in window of an Anniston branch of the First Alabama Bank, where Mr. Blackmon maintained an account. At around 9:00 p.m. that night, Julie Greenwood, petitioner Boyd's ex-girlfriend and Evelyn Blackmon's twenty-year-old daughter, returned to the Blackmons' house, where she lived, only to discover that Fred and Evelyn Blackmon were missing, along with their black Cadillac Eldorado. Two days later, Julie and her father, Wayne Greenwood, filed a missing person's report with the Anniston Police Department. The Blackmons were never seen alive again.

At about 8:40 a.m. on March 26, 1986, the day the Blackmons disappeared, Anniston Police Officer Ken Murphy was on routine patrol in the Blackmons' neighborhood. He noticed a 1976 white, two-door Chevrolet Camaro illegally parked near the intersection of Sunset and Fairway Drives, a quarter of a mile from the Blackmons' home. The license plate number on the illegally parked vehicle had been issued to William Glenn Boyd.

3

Soon thereafter, Boyd was arrested on the charge of first degree kidnaping on April 3, 1986. After being advised of his Miranda rights, Boyd signed a waiver-of-rights form and gave a statement to the police concerning the Blackmons' disappearance. In addition, Anniston Police Officers Robertson and Hall impounded Boyd's automobile. The same day, the police arrested Robert Milstead, who also gave a statement to the police about the Blackmons.

In the afternoon of April 3, 1986, the police -- accompanied by Milstead -- went to the locations where each of the Blackmons had been separately killed. At the scene of Mrs. Blackmon's murder, police found a trail through the woods. Officer Watson discovered bleached hair entwined with white fiber. Watson collected soil and debris samples which contained blood-stained leaves and soil. A .25 caliber shell casing was found close to the blood stain. The hair found near the blood stain later was microscopically compared to a hair sample taken from Mrs. Blackmon's body and determined to be the same.

Mr. Blackmon's 1985 Cadillac Eldorado was recovered from the Coosa River on April 4, 1986. Fred Blackmon was found dead, stuffed into the trunk of the car. The windows were down, the doors were unlocked, the ignition key was in the on position, and the car was in first gear. Upon discovering that the car's tail light was broken, the officers went to the area in Calhoun County where Milstead

4

said Mr. Blackmon had been murdered. At that location, in the middle of a dirt road, the officers found broken pieces of a red plastic tail light lens, a silver plastic Cadillac emblem, two spent .25 caliber shell casings, and a long white fiber. On the same day the Blackmons' car was recovered, Officer Townsley went to Milstead's house, where he discovered an ax and several blue metal drums.

The state medical examiner, who performed an autopsy on Mr. Blackmon, found a torn strip of white cloth tied around his mouth as a gag. Mr. Blackmon had been shot twice. One of the gunshots penetrated his neck and the other passed through the heart. Both bullets were recovered. Mr. Blackmon also had suffered a minor blunt force injury to the back of his head. The gun shot wounds were determined to be the cause of his death.

Officers Watson and Bradley inventoried the contents of Boyd's Chevrolet Camaro on April 7, 1986. They found a piece of white and yellow entwined cloth, knotted on one end, with hair entwined in the knot, as well as a black mesh shirt, a pair of blue underwear, a black jacket, and another piece of cloth on the right front floorboard. They also discovered a roll of gauze in the console of the car along with a yellow-gold necklace inside an envelope. The necklace later was identified as belonging to Mrs. Blackmon. Two spent .22 caliber shell casings were found on the dashboard.

On April 9, 1986, a metal drum containing Evelyn Blackmon's body was recovered from the Coosa River too. Mrs. Blackmon's mouth had been gagged and a piece of cloth had been tied around her ankles. She had sustained three gunshot wounds: a superficial wound to her head; a wound to the right side of her neck; and a wound to her back. Mrs. Blackmon also had sustained a laceration to her right forehead, numerous fractures to her nose and face, and an ax wound to her lower back that broke her backbone. The gunshot wounds were determined to be the cause of her death.

At trial, there was conflicting testimony regarding whether Boyd had murdered Fred Blackmon, Evelyn Blackmon, or both victims. Anniston Police investigator Gary Carroll testified that Boyd insisted in his first statement to the police that his accomplice, Milstead, had killed both victims. Specifically, Boyd told the police that on the morning of March 26, 1986, he and Milstead, both armed, gained entry into the Blackmons' home. Boyd and Milstead had previously discussed robbing the Blackmons. Boyd admitted that he accompanied Mr. Blackmon to the bank, where Mr. Blackmon withdrew $5,000 and turned it over to Boyd, and returned to the Blackmons' house. Boyd and Milstead then forced the Blackmons into Mr. Blackmon's Cadillac Eldorado and drove to an area in Ohatchee, Alabama, near the river. After the car was parked, Milstead, according

6

to Boyd, physically assaulted Mrs. Blackmon, and then shot her.  Mr. Blackmon tried to barter for his life, but Boyd hit him on the back of the head, and then Milstead shot him too.  Boyd and Milstead left the crime scene in the Cadillac Eldorado, only to return later that night.  They stuffed Mr. Blackmon's body in the trunk of the Cadillac Eldorado and rolled the car down a boat ramp into the river.  They left and returned to the crime scene still again the next morning, stuffed Mrs. Blackmon's body into a 55-gallon barrel and rolled the barrel into the river.  They later disposed of the two guns used during the crime by throwing them into a creek.

On April 4, 1986, Boyd gave a second statement to the police that provided a detailed description of how to find the locations of the crime scenes.  Boyd provided a third statement on April 6, 1986, claiming that he had remained in the car with Mr. Blackmon while Milstead took Mrs. Blackmon into the woods.  Boyd said that Milstead was just supposed to leave her there, but decided to kill her instead.  Boyd accompanied police to a creek on April 11, 1986, to show them where the guns had been discarded after the murders.  A nickel-plated Raven Arms Company .25 caliber automatic pistol and a black .22 caliber pistol were recovered.  There was one unfired round in the .25 caliber pistol, and five rounds still in the .22 pistol.

Milstead's statements and testimony, on the other hand, said that Boyd had killed both victims. Milstead pleaded guilty to capital murder and testified for the State against Boyd, in exchange for a sentence of life without parole. Prior to testifying, he had given five statements to the police, which varied in certain respects, but four of them consistently accused Boyd of shooting both victims as well as assaulting them.

Milstead testified that on the morning of the crime, Milstead, who did not know the Blackmons, gained entry into the Blackmons' house along with Boyd; they were both armed with loaded pistols. Boyd then gagged and blindfolded Mrs. Blackmon, and threatened the Blackmons that Mrs. Blackmon's daughter, Julie, had been taken hostage and would be killed if the Blackmons did not pay a ransom. Boyd forced Fred Blackmon to go to the bank to withdraw money, leaving Mrs. Blackmon alone at the house with Milstead. After Mr. Blackmon withdrew $5,000 and gave the money to Boyd, they returned to the home. Boyd and Milstead then forced Fred and Evelyn Blackmon at gunpoint into Mr. Blackmon's Cadillac Eldorado, and drove them to a secluded area by the river.

At that point, they separated the Blackmons, first forcing Mrs. Blackmon to walk away from the car to a clearing behind a brush pile. Boyd then re-gagged and blindfolded Mrs. Blackmon, and, after talking to her, struck Evelyn Blackmon

8

across her forehead and nose with a stick. Mrs. Blackmon screamed, whereupon Boyd tried to strangle her with a cloth. Boyd then shot Mrs. Blackmon with a .22 caliber pistol, which he had muffled with the cloth. After she continued to fight for her life, Boyd took the .25 caliber gun from Milstead, who was standing with them, and shot her still again in the back and in the head.

Boyd and Milstead returned to the car and drove Mr. Blackmon to another location. After exiting the car, Boyd hit Mr. Blackmon's head with a stick. This blow also broke the taillight on Mr. Blackmon's Cadillac. Boyd then took a piece of cloth and started choking Mr. Blackmon with it. When Fred Blackmon struggled for his life and stabbed Boyd with a stick, Boyd took out the .25 caliber pistol and put it to Mr. Blackmon's throat. Mr. Blackmon begged Boyd not to shoot him, offering to give him $50,000. Boyd told Fred Blackmon that it was too late, and shot him in the chest and neck with the .25 caliber pistol. Boyd and Milstead left the scene in Mr. Blackmon's car. They returned later that night to the location of Fred Blackmon's murder, stuffed his body into the trunk of his car, and rolled it into the Coosa River. After a few minutes, the car sank. They threw the two pistols into a creek that night.

The next morning, Boyd and Milstead returned to the crime scene, finding Mrs. Blackmon's body. By Milstead's account, Boyd said the body was too stiff,

9

so he took Milstead's ax and tried to cut Mrs. Blackmon's body in half. Boyd then took the body and broke Evelyn Blackmon's back, and along with Milstead threw her body into a metal barrel along with some cement blocks and rocks. Boyd cut some holes in the barrel with the ax. He and Milstead rolled the barrel into the river. The barrel sank in the water.

Kenny Surrett, who had grown up with Boyd, also testified for the State, providing another conflicting account indicating that Boyd had confided that he had shot Fred Blackmon, but not Mrs. Blackmon. Surrett said that on the night of March 25, 1986, the evening before the Blackmons were kidnaped and murdered, he was with both Boyd and Milstead. Surrett saw, among other things, a chrome or silver .25 caliber automatic pistol in Boyd's possession.

On the night of March 27, 1986, the day after the Blackmons disappeared, Surrett drove to Boyd's house to collect on a bad check Boyd had given him. Soon after Surrett arrived, Boyd said, "Kenny, I didn't realize how coldblooded I was." R739.[1] Boyd then said he had something to tell Surrett. Boyd admitted that he and Milstead had gone to the Blackmons' house to rob them, and Boyd had taken Mr.

---

[1] "R" refers to pages in the transcript of the 1987 trial; "CR" refers to the clerk's record of that same transcript. "Vol." refers to the state post-conviction record. The post-conviction record originally consisted of 20 volumes. Any citation to this 20 volume transcript will include a reference to the volume number (e.g., Vol.16 at _). There were two supplements to the state post-conviction transcript, one supplement was six volumes in length and the other was three volumes. "Supp.Vol. __ of 6" refers to the six-volume supplement. "Supp.Vol. _ of 3" refers to the three-volume supplement.

Blackmon to the bank where Mr. Blackmon withdrew some money. Milstead and Boyd then took the Blackmons to the river. Boyd said he hit Fred Blackmon on the back of his head with a stick and then shot him. Boyd also told Surrett that Milstead hit Mrs. Blackmon in the nose and shot her a couple of times. Boyd confessed that he chopped Mrs. Blackmon's back with an ax in order to be able to dispose of her body in a barrel. Boyd paid Surrett with money that, Boyd said, he had obtained from Fred Blackmon. A week later, Boyd joked with Surrett about the Blackmons being "at the bottom of the river." R745.

Sharon Johnson, who was dating Boyd at the time of the crime, gave an account of events roughly consistent with Surrett's. She testified that Milstead told her that he shot Mrs. Blackmon, and Boyd shot Mr. Blackmon. Johnson further said that she saw Boyd with approximately $3,000.

The Calhoun County Grand Jury indicted Boyd on eight counts of capital murder on April 25, 1986. The first four counts charged him with murder during the course of a kidnaping, in violation of Ala. Code § 13A-5-40(a)(1), and the remaining four counts charged him with murder during the course of a robbery, in violation of § 13A-5-40(a)(2). On March 16, 1987, Boyd's capital murder trial began. The jury returned verdicts on March 20, 1987, finding Boyd guilty on all eight counts.

11

**B.    The Sentencing Hearing Before the Jury**

The penalty phase of the trial began the same day that Boyd was convicted. Although his lawyers had asked for the evening to prepare, the court gave them only "a few minutes." R966.

The prosecutor did not present any evidence at the sentencing hearing before the jury, and instead relied on evidence presented at the guilt phase to argue in support of finding two statutory aggravating circumstances: (1) the capital offense had been committed during a robbery and kidnaping, see Ala. Code § 13A-5-49(4); and (2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see id. § 13A-5-49(8). In response, defense counsel presented four witnesses: Cindy Pierce, Boyd's sister; Geraldine Oliver, Boyd's mother; Herbert Hicks, a pastor; and Boyd himself.

At counsel's direction, Cindy Pierce had prepared a "life history" of Boyd that she read to the jury. Cindy's testimony emphasized the following themes:

> 1. Boyd's parents divorced when Boyd was two; Boyd's father went to prison, and attempted to escape from jail, leaving bad publicity and scars for the family; Boyd did not have much contact with his father, and as a result was adversely affected;

> 2. Boyd's younger sister was physically and mentally challenged; as she became older, the family, including Boyd, had to put her in physical restraints when she became violent;

12

3. Boyd grew up in an impoverished setting; at one point, Boyd and a friend burned down the family's trailer; Boyd was embarrassed by his family's financial difficulties;

4. Boyd had difficulties in school, ultimately dropping out at sixteen;

5. Boyd's mother remarried when Boyd was seven; this was difficult because Boyd was close to his mother and did not want to share her with anyone else; Boyd developed "serious problems" with his stepfather, who was "very strict and demanding";

6. Boyd's grandfather died when Boyd was fourteen; this was difficult for Boyd as his grandfather essentially served as Boyd's father;

7. Boyd's stepfather's son was a bad influence on Boyd; when they got in trouble, Boyd's stepfather took his son's side;

8. At sixteen, Boyd moved to New Mexico to live and work with his great uncle; this was a "great opportunity" but Boyd became mired in debt and was "too immature to take advantage" of the opportunity; Boyd's grandmother paid off his debt and Boyd returned to Alabama;

9. Boyd had a romantic relationship with Julie Greenwood but Julie's mother, Evelyn Blackmon, forbade her daughter to date Boyd;

10. Boyd's sister, Cindy, married when Boyd was nine; Boyd grew very close to Cindy's husband who became a "brother figure";

11. Boyd was a loving and caring uncle to Cindy's two children;

12. Boyd lived with Cindy and her husband after moving out of his mother's home when he was fourteen but eventually left Cindy's home because he resented her discipline;

13. Boyd's grandparents, to whom Boyd was close, were alcoholics;

14. Boyd served six months in jail for burglary when he was eighteen;

15. Boyd attended church as a youth and it was important to him. See R974-91. Cindy also testified that Boyd expressed remorse for the crime and explained that "it was never meant to happen." R989.

Boyd also testified at the sentencing phase, apologizing for "what happened," and offering that he wished he could undo his actions. R991-92. Boyd's mother testified that Boyd was "sorry for all the hurt and pain that" he had caused. R993, 998. She described Boyd as a loving and caring person who was always very helpful. She said that she loved her son and tried to "bring him up in the right way." R997-98. Finally, Pastor Herbert Hicks testified, after visiting Boyd in jail at the request of Boyd's mother. Pastor Hicks said that Boyd was sorry for his involvement in the crime even though he was "not guilty." R999-1000. In addition, Boyd "had turned his face to the Lord and . . . had made things right with Him." R1000.

Following this testimony, defense counsel said to the jury: "You have heard it all. There's not much I can add. The decision is yours." R1002.

The jury recommended, by a vote of seven to five, that Boyd be punished by life imprisonment without the possibility of parole. Thereafter, a date for the sentencing hearing before the trial judge was set.

**C.     The Sentencing Hearing Before The Trial Judge**

14

The same judge who had presided over Boyd's trial commenced a sentencing hearing on April 9, 1987, nineteen days after the sentencing hearing before the jury. Alabama employs a trifurcated proceeding for the trial and sentencing of persons charged with capital offenses: (1) the guilt-innocence phase; (2) the penalty phase, during which the jury issues an advisory sentencing verdict based on its evaluation of aggravating and mitigating circumstances, see Ala. Code § 13A-5-46; and, finally, (3) a phase, after the jury has rendered its advisory verdict at the penalty phase, at which time the trial judge orders and receives a presentence investigation report, takes further argument, and may receive additional evidence concerning the aggravating and mitigating factors. Thereafter, the trial judge is obliged to enter written findings as to these factors and impose sentence. See id. § 13A-5-47; Brownlee v. Haley, 306 F.3d 1043, 1050 (11th Cir. 2002).

At the sentencing hearing before the trial judge, neither Boyd nor the State offered any additional evidence, although both presented arguments in support of their positions. The trial judge then sentenced Boyd to death, and said that a written order would be filed later. In the sentencing order, the trial judge found the existence of two statutory aggravating circumstances: (1) the capital offense was committed while the defendant had been engaged in the commission of robbery

15

and kidnaping, see Ala. Code § 13A-5-49(4); and (2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see id. § 13A-5-49(8).

The trial judge amplified the second aggravating circumstance with these written findings of fact:

> (a) Th[e] Defendant invaded the privacy of the victims, threatened to kill their daughter (and step-daughter), robbed them, kidnaped them at gun point from their home, bound and gagged them, took them to a remote area and abused both of them while they were fighting and begging for their lives.
>
> (b) The Defendant inflicted severe pain and suffering upon both victims by hitting them on the head and in the face with a large limb while they were tied up and blindfolded.
>
> (c) The Defendant shot each victim two or three times after physically abusing them.
>
> (d) The Defendant used an ax to cut Evelyn Blackmon so that her body would go into a 55 gallon drum.
>
> (e) The Defendant bragged about the killings and about how cold blooded he was.

CR201.

The trial judge also found one statutory mitigating circumstance: Boyd was twenty years of age on the date of the offense. In addition, the trial judge took into account a non-statutory mitigating circumstance: the fact that Boyd, to some degree, had assisted police in locating the bodies of the victims and the weapons

16

used in the murders. The trial judge also expressly took into account all of the evidence presented concerning Boyd's "background and character as the same pertains to the mitigating circumstances that should be properly considered by the Court." CR202. The trial judge explained that the jury's penalty phase verdict possibly had been influenced by the very emotional testimony offered by Boyd's sister and mother. Finally, the trial judge concluded that "[w]hile the mitigating circumstances and the jury's recommendation of life without parole have weighed heavy in the Court's consideration, this Court does now find, and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances of this horrible, cold blooded crime as shown and brought before the Court far outweigh the mitigating circumstances shown to the Court." CR203.

## D. Background Regarding the Performance of Boyd's Counsel

Boyd was represented at trial by Stephen Levinson and Grant Paris; Mannon Bankston, Jr. assisted. Only Levinson testified as a witness at Boyd's state habeas court evidentiary hearing ("the Rule 32 hearing"). According to Levinson, none of Boyd's lawyers had previously handled a capital case. Levinson had practiced for eight years before he represented Boyd, and had handled about six felony jury trials.

Levinson felt that he had the primary responsibility for pretrial preparation, although added that he would not be surprised if Grant Paris "felt that it evolved to him." Vol.16 at 109. Boyd would not initially speak with Levinson, but they eventually communicated some fifteen to twenty times before trial. As for witnesses, Boyd's counsel spoke with Boyd's mother, his sister, his brother, his brother-in-law, and his stepfather. Counsel learned that Boyd's father left the home when Boyd was about two years old. However, counsel did not talk to any family members about the possibility of neglect or deprivation, and did not obtain any official records about Boyd or his family. Levinson also "possibly" contacted Sharon Johnson, and unsuccessfully tried to contact Kenny Surrett, who feared he would be charged as an accessory if he did not testify against Boyd, since he had taken money from Boyd after the murders. Id. at 110, 118. Co-counsel Paris contacted the pastor.

Counsel also hired an "independent" psychologist, Dr. Alan Krichev, to evaluate Boyd, because they did not want Boyd sent to Taylor Harden Secure Medical Facility, a state-run mental health hospital.[2] Dr. Krichev prepared a report concluding that Boyd had not suffered from any mental illness and was competent. The report further opined that "[t]here were no indications of major psychopathy,"

---

[2] Notably, Dr. Krichev was not presented at the Rule 32 state habeas evidentiary hearing.

and that Boyd showed a "lack of emotional content but otherwise w[as] not pathological in nature." Vol.16 at 157-58. Levinson decided that he would not call Dr. Krichev as a witness, since he "didn't know how [the report] would help Glenn." Id. at 116. Levinson admitted that he lacked an understanding of the tests Dr. Krichev performed, which was probably "due to my inability to either understand or ask." Id. at 156.

Levinson suggested that there was "some dissension between the attorneys" about "how we should handle the case, who should do what, and what essentially our strategy or theory of defense was." Id. at 105. "We didn't really have a defense strategy other than . . . to dispute what Robert Milstead was saying as best we could with what we had." Id. at 126. Although Levinson thought it important to impeach Milstead, Milstead's attorney would not let Boyd's counsel speak with him before trial, and Levinson did not talk to any of Milstead's family or neighbors. Nor did Levinson consult with an independent pathologist or with the State's pathologist in preparation for trial.

Levinson offered that he was "possibly" in charge of the penalty hearing before the jury, and "guess[ed]" he did the preparation for it. Id. at 129. Levinson did not expect to have to start the penalty phase right after the guilt phase, but rather hoped to get an overnight continuance. In approaching the penalty phase,

"there was an assumption that if there was a conviction, we would try to mitigate the effect of the conviction through a family member's testimony; humanize the defendant, so to speak." Id. at 132.

Accordingly, Levinson asked Boyd's sister Cindy to write a story about her brother, "essentially ask[ing] her to tell me some positive things about Glenn's life as she grew up with him and as she knew him: to humanize him." Id. at 131-32, 153-54. Levinson "[e]ssentially asked" Boyd's mother "to do the same thing, give us something to let the jurors see what type of person Glenn is in terms of his positive aspects, his good side, his bright side." Id. at 153-54. Levinson said that he met with Cindy and Boyd's mother more than five times. He conceded that he would have welcomed evidence that Boyd grew up in a violent, abusive, or alcoholic home for a mitigation case, but that he did not investigate any of these possibilities. He also admitted that a penalty phase investigation might have been helpful.

Cindy, Boyd's sister, testified at the Rule 32 hearing that she met with Levinson about five times. Levinson asked Cindy about three months before trial to write a story about Boyd's life, but she did not really know the purpose of writing the story. In a meeting some two days before trial, Levinson told Cindy that she would be called as a witness. Cindy said that Levinson met with her

mother only on that one occasion. Cindy did not know what she would be testifying to until the day she testified, when Levinson called her into the hall and told her to read to the jury the account she had written. Cindy offered that the lawyers had not asked her about the violence, neglect, abuse, or alcoholism in their home, but that she would have been willing to testify about these issues.

Levinson added that no one was in charge of the sentencing hearing before the judge that followed the jury's verdict, and that they did not present additional evidence at that time because "[w]e stupidly thought that the judge would accept the jury's recommendation." Id. at 129-30, 145.

Levinson also represented Boyd on appeal. He considered raising on appeal whether the State had presented false or misleading testimony through Milstead, but said that while he thought Milstead was a liar, he did not think the State "had anything to do with that," since he did not "think the state would have knowingly put on perjured testimony." Id. at 137.

E. **Potential Mitigating Evidence**

Boyd presented several witnesses at the state habeas hearing to testify about further mitigating evidence that could have been introduced at his original trial.[3]

---

[3] In addition, records maintained contemporaneously by social service institutions, hospitals, schools, and other agencies were made available to the state habeas court. These records document: the stepfather's abuse; alcoholism in the family; family depression and suicide attempts; Boyd's mother's inattention to her children's needs; the family's lack of

21

Jan Vogelsang, a clinical social worker with some fifteen years of expertise in victimization and child trauma, testified about the "psychosocial assessment" she performed on Boyd. Vol.17 at 171. Her summary of the various risk factors apparent in Boyd's life included the following.

First, Boyd's father, Butch, was an alcoholic who was in and out of jail throughout Boyd's childhood, humiliated his children and failed to support them, attacked his aging parents, and when he would return to the house unannounced and raging, he would destroy its contents.

Second, Boyd's stepfather, Don Oliver, who married Boyd's mother when Boyd was eight, was a brutal man who beat the children. He regularly assaulted Boyd's mentally disabled sister, Susie, and would lock her in her room for days and weeks. Oliver's beatings of Boyd's sister Cindy ultimately led social services to remove her from the home. On one occasion Oliver struck Boyd with his fists when Boyd sought to intervene in defense of his sister Susie, beat him another time when Boyd tried to protect his mother, and frequently hit Boyd on the head with a rifle butt when they went hunting. However, Oliver's violence toward Boyd was not documented in any social service agency records. In addition, Dr. Karl

resources; and his father's incarceration.

22

Kirkland, the psychologist testifying on behalf of the State, said that Boyd had told him that Oliver hit him on the head with a rifle butt on <u>one</u> occasion.

Third, Boyd's mother loved her children but was unable either to provide for or to protect them, and attempted suicide when Boyd was eleven. Rats and snakes crawled in and out of the children's belongings; when there was insufficient food, Boyd and his siblings sought nutrients from dirt, and also received food from their grandparents. Several of the social service records did say, however, that the children appeared to be well cared for and supervised, but these records also indicated that the Boyds frequently received governmental assistance.

Fourth, Boyd's alcoholic grandparents, at whose house Boyd spent significant amounts of time, beat each other in front of the children, who were "used to seeing them crawl in the house drunk on their knees." <u>Id.</u> at 194, 196. Their drunkenness led them to jeopardize the children's safety, as when they forced then-twelve-year-old Cindy to drive the family home from Florida to Alabama with six-year-old Boyd beside her.

Finally, Boyd's sister Cindy, who attempted to parent him, was only a child herself, and at some point, tried to kill herself. Cindy left when Boyd was nine years old and Oliver cut off her contact with Boyd, who was "basically left to more or less figure out life for himself." <u>Id.</u> at 182, 212-13.

23

Based on these circumstances, Vogelsang claimed that Boyd's upbringing represented one of the worst family situations she had seen in terms of violence, neglect, and alcoholism. Vogelsang concluded that Boyd presented a high risk of being impulsive, had become emotionally constricted, and could not make sound decisions based on what he knew.

On cross-examination, Vogelsang admitted that she had not considered the following positive factors, which were also present in Boyd's life: (1) Boyd had very close relationships with his mother, his paternal grandparents, his sister, and his sister's husband; (2) Boyd and Julie Greenwood had a romantic relationship in which they discussed marriage; and (3) Boyd's great uncle, when Boyd was fifteen or sixteen years old, allowed Boyd to come live with him in New Mexico in order to teach Boyd how to become a mechanic.

Cindy Pierce, Boyd's sister, also testified at the Rule 32 hearing about Boyd's deprived family background, conveying both more and in greater detail than she did at trial about the abuse and neglect the children had endured. Cindy confirmed that: (1) their grandparents were alcoholics who "fought" with each other, Vol.17 at 11-14; (2) their father was rarely around, but when he was, he was "crazy," would come in and destroy the furniture, would knock or slap down their mother, and occasionally beat his parents, id. at 23-26, 28; and (3) their stepfather

24

was very cruel, treated their mother like a slave, beat her severely twice, beat sister Susie at least three times a week, and while he "wasn't as quick and easy to beat [Boyd] as he was myself and [Susie]," probably beat Boyd about once a week. Id. at 29-33.

Despite growing up in the same household as Boyd, Cindy did not commit any crimes, and at the time she testified, worked as a training supervisor at a manufacturing company. She explained that Boyd moved in with her at some point when he was approximately fourteen years old but that her efforts to discipline him were not well received. She also said that Boyd did not take advantage of the opportunity offered by their great uncle.

At the Rule 32 hearing, Calhoun County Sheriff Roy Snead singled out Boyd's father as suffering from serious alcoholism; he added that the father had been arrested twenty-six times. Retired Anniston police officer Bill Whatley also offered an episode of Oliver's domestic abuse. Childhood neighbor Kathy Gurley, familiar with the stepfather's physical and verbal assaults on Boyd and the mother's helplessness, testified that violence was endemic throughout Boyd's neighborhood. Gurley opined that Boyd was among the kindest of the youngsters she knew and believed his involvement in these offenses was wholly out of character.

25

Boyd also relied upon the testimony of Dr. Louis Tetlow, a clinical psychologist for the Louisiana Department of Corrections. Dr. Tetlow performed a number of tests on Boyd and concluded that Boyd, among other things, had trouble planning ahead, was short-sighted and impulsive, unable to evaluate possible consequences or trust others, expressed emotional constriction, indicating an inability to be empathetic, had an abiding problem with authority, and evinced anger and rage. Dr. Tetlow further opined that Boyd had been adversely affected by his father's absence, and by the beatings he sustained at his stepfather's hand while his mother sat by passively.

Dr. Tetlow concluded, however, that Boyd had above-average intelligence, no delusional beliefs, no signs of organic brain damage, and no history of alcohol or drug abuse. Dr. Tetlow agreed with Dr. Krichev's pre-trial evaluation that Boyd did not meet the criteria for a psychological diagnosis and "really d[id] not have a major mental disorder." Vol.19 at 446.

Dr. Karl Kirkland, a licensed psychologist certified by the State as a forensic examiner, testified on behalf of the State at the Rule 32 hearing. Dr. Kirkland described what he had heard during Boyd's post-conviction hearing as "a pervasive history of emotional and physical abuse that has been very well documented." Vol.20 at 500-01. But, Dr. Kirkland opined, while Boyd had difficulty in

26

expressing emotions, he was capable of recognizing many emotions and expressing many of those feelings. Dr. Kirkland said that Boyd could easily form emotional attachments; he described the close relationships Boyd had with his sister Cindy, with his mother and grandparents, and with Cindy's husband, and his fairly typical adolescent romantic relationship with Julie Greenwood.

Dr. Kirkland agreed with the conclusions of Drs. Krichev and Tetlow that Boyd did not meet the criteria for any psychological diagnosis, and presented no mental health history, and no drug or alcohol history. Dr. Kirkland further observed that Boyd was of average intelligence, scoring high in comprehension and low in math, and that possible learning difficulties in math might have explained why he left school early. Dr. Kirkland also noted Boyd's positive work history -- including work in a fast-food restaurant as a dishwasher for a year, for a railroad company for a year, as an auto mechanic for three years, and as a television satellite technician for three to four months, rising to the level of a crew chief.

Dr. Kirkland concluded that the abuse Boyd suffered in his childhood did not cause Boyd to commit murder. Regarding Boyd's mental state at the time of the offense, Dr. Kirkland said that he could not find any evidence to suggest that Boyd was suffering from a mental illness at the time he committed the offenses or

27

anything else that would reduce his criminal responsibility. Dr. Kirkland added

that Boyd recognized the criminality of his conduct and was in complete control of

his behavior at the time of the crime.

## F.     Post-Trial Procedural History

### 1.      Boyd's Direct Appeal

Boyd appealed his conviction and sentence to the Alabama Court of

Criminal Appeals. He was represented again by one of his trial lawyers, Levinson,

and Michael Allsup, a lawyer appointed by the court for purposes of appeal. Three

claims were made on direct appeal: (1) the warrantless search of Boyd's

impounded vehicle was unreasonable, and the evidence seized as a result of that

search should have been deemed inadmissible; (2) the trial judge erred by refusing

to answer the jury's request that he define the distinction between "Murder and

Capital Murder"; and (3) the Circuit Court lacked jurisdiction to try Boyd for

Evelyn Blackmon's murder.

The Alabama Court of Criminal Appeals rejected each of Boyd's claims, and

affirmed Boyd's conviction and death sentence. Boyd v. State, 542 So. 2d 1247

(Ala. Cr. App. 1988). Among other things, the court affirmed the trial judge's

decision to sentence Boyd to death, concluding that it had "found no evidence in

th[e] record that the sentence was imposed under the influence of passion,

28

prejudice, or any other arbitrary factor." Id. at 1260. The appellate court independently re-weighed the aggravating and mitigating factors considered by the trial judge, a process which the court said "convinces us that death was the proper sentence to be imposed in this case." Id. The Alabama Court of Criminal Appeals added that Boyd's sentence was not disproportionate to the penalties that had been imposed "in similar cases," and that "[we] carefully searched this record for plain error and [we] have found none." Id.

Boyd petitioned the Supreme Court of Alabama for certiorari review; that court affirmed the decision of the Court of Criminal Appeals. Ex parte Boyd, 542 So. 2d 1276 (Ala. 1989). The United States Supreme Court denied certiorari. Boyd v. Alabama, 493 U.S. 883 (1989).

### 2. State Habeas Proceedings

In July 1990, Boyd, represented by new counsel, filed a petition for post-conviction relief pursuant to Rule 20 of the Alabama Temporary Rules of Criminal Procedure, since renumbered as Rule 32. Boyd raised thirty-two claims in his Rule 32 petition, many with numerous sub-claims, including the suggestion that Boyd had received ineffective assistance of counsel both at trial and on direct appeal. The State responded, arguing that all of the claims, except those alleging ineffective assistance of counsel, were procedurally barred. After the state habeas

29

court summarily dismissed Boyd's petition, Boyd moved for reconsideration of the dismissal of the petition, and on October 16, 1990, the trial court reinstated the petition.

Boyd then filed an amended Rule 32 petition on July 8, 1994, raising thirty-seven claims, including thirty-one subclaims involving ineffective assistance of counsel. On September 7, 1994, the Rule 32 trial judge entered an order of partial dismissal, dismissing all of Boyd's claims except for those raising ineffective assistance of counsel, finding that the dismissed claims were foreclosed by Rule 32.2(a) and subject to summary dismissal pursuant to Ala. R. Crim. P. 32.7(b). Boyd's Rule 32 petition primarily contended that his trial counsel had failed to investigate his background, or to conduct in-depth interviews with family members, or finally, to otherwise develop mitigating evidence for the sentencing phase.

Beginning on September 8, 1994, and continuing on October 6, 1994, October 7, 1994, and October 12, 1994, the state habeas court conducted an evidentiary hearing at which the parties submitted oral testimony, exhibits, and depositions. After receiving post-hearing briefs, the trial judge denied Boyd's Rule 32 petition on July 25, 1997. The trial court explained its ruling this way:

> The Petitioner raises thirty (30) separate claims of ineffective
> assistance of counsel, both at the trial level and appellate level. Upon

consideration of all of the above as it concerns and applies to each separate claim, this Court finds that the Petitioner has failed to show that his counsel's representation, both at the trial level and appellate level, fell below the objective standard of reasonableness or that there was a reasonable probability that but for counsel's unprofessional errors, if any, the outcome of his case would have been different, as required by Strickland v. Washington, 466 U.S. 668 (1984).

Vol.5 at 944-45.

Boyd appealed on September 4, 1997, raising numerous issues, including substantive claims alleging errors at trial and claims that his trial counsel and appellate counsel were ineffective. He also contended that the trial court erred in summarily dismissing claims that were properly presented in his Rule 32 petition. On December 18, 1998, the Alabama Court of Criminal Appeals affirmed the denial of relief. Boyd v. State, 744 So. 2d 954 (Ala. Crim. App. 1998) (Table). Following Boyd's application for rehearing, the court withdrew the memorandum opinion and issued a published opinion on March 26, 1999, again affirming the denial of Boyd's Rule 32 petition. Boyd v. State, 746 So. 2d 364 (Ala. Crim. App. 1999).

The Alabama Court of Criminal Appeals described the evidence in support of Boyd's penalty phase ineffectiveness claim:

At the Rule 32 hearing, Boyd presented a wealth of testimony characterizing his childhood as consisting of continual gross poverty; gross physical and emotional abuse; gross neglect; and various humiliations. These indignities were bestowed at the hands of a cruel

31

and alcoholic father and stepfather; a mentally disturbed mother; and loving but severely alcoholic grandparents.

Id. at 377; see also id. at 377 n.5 (noting the witnesses who testified regarding the ineffectiveness claim, among others). After recounting the testimony of the Rule 32 experts (Vogelsang and Dr. Tetlow for Boyd, and Dr. Kirkland for the State), the court concluded that each found that Boyd had made a "choice" to participate in the offense and that his horrific upbringing did not "cause" him to commit murder. Id. at 377.

As for counsel's performance at the penalty phase, the trial court characterized Levinson's "assumption" that upon conviction counsel would "try to . . . humanize the defendant, so to speak," as a "tactical choice" that could not be second-guessed. Id. at 379. The court reiterated this conclusion when addressing counsel's subsequent performance before the sentencing court. Additionally, it held that the Alabama statute "does not provide for the presentation of additional mitigation evidence at sentencing by the trial court," and that trial counsel therefore did not err in failing to present any. Id. at 398. The Alabama Court of Criminal Appeals also noted that "Levinson's penalty phase strategy was successful; the jury recommended, by a vote of 7-5, that Boyd be sentenced to life imprisonment without parole." Id. at 379.

The court further concluded that Boyd had failed to show that the lack of psychological evidence or any other evidence at the sentencing phase prejudiced him. It observed that "[i]n overruling the jury's recommendation and sentencing Boyd to death, the trial court found that these crimes were 'extremely wicked and shockingly evil[,' and that] all Capital offenses are heinous atrocious and cruel to some extent, but the degree of heinousness and cruelty in these offenses far exceeds that which is common to all Capital offenses." Id. (citing Boyd, 542 So. 2d at 1268). The court determined that Boyd's background was not a "factor" in the murders and that Boyd knew right from wrong, and thus concluded that the trial court would not have been persuaded to follow the jury's recommendation even had this evidence been presented. Id. at 379. It said:

> We do not believe that this additional evidence would have shifted the balance between the aggravating circumstances and the mitigating circumstances and changed the outcome of the trial. . . . Had the testimony presented at the Rule 32 hearing regarding Boyd's childhood been presented at the sentencing hearing it is highly unlikely that the trial court would have been persuaded to sentence Boyd differently.

Id.

The Alabama Court of Criminal Appeals also considered the merits of Boyd's claim that counsel failed to effectively impeach Milstead. It held that expert assistance to challenge Milstead's assertions "would [not] have changed the

33

outcome of the trial." Id. at 385-86. As for the sentencing impact of Milstead's testimony, the court pointed to other evidence supporting the heinous, atrocious or cruel aggravating factor. Id. at 387.

The court also determined that both the juror misconduct and the knowing-use-of-false-testimony claims had been defaulted. As for the former, it held that the trial court had "properly denied" the claim because it had not been pled pursuant to Ala. R. Crim. P. 32.1(e), which requires both proof of innocence and proof that the new facts would lead to a different result. Boyd, 746 So. 2d at 405-07. It also ruled that the claim that the prosecution knew or should have known that it was introducing false testimony was presented differently in the trial court than on appeal. Id. at 409. The court also denied this claim on the ground that it too should have been pled pursuant to Rule 32.1(e). Id.

Boyd sought certiorari review on all of his claims, but the Alabama Supreme Court denied certiorari without opinion. Ex parte Boyd, No. 1981080 (Ala. Oct. 22, 1999).

### 3.    Federal Habeas Proceedings

On October 16, 2000, Boyd commenced this federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in the United States District Court for the Northern District of Alabama, raising thirty-four claims. After receiving

34

extensive briefing from both sides, the district court filed a 192-page memorandum opinion denying Boyd's habeas petition in all respects. See D. Ct. Docket Entry ("Doc.") 40 (filed Dec. 7, 2004).  Notably, the district court denied Boyd's claim of ineffective assistance of counsel during the penalty phase, on the ground that it "agree[d] with the conclusion of the Alabama Court of Criminal Appeals, that Boyd cannot satisfy the [Strickland] . . . prejudice prong, which focuses on whether the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Doc. 40 at 69 (quotation, punctuation, and citations omitted).  The court reached this conclusion based on its assessment that Boyd's argument as to prejudice rested on "a speculative foray into conceivable, but imponderable, outcomes."  Id.

On December 22, 2004, Boyd moved the district court to alter or amend the judgment, pursuant to Fed. R. Civ. P. 59(e).  Almost three years later, the district court granted in part and denied in part Boyd's Rule 59(e) motion.  Doc. 48. Specifically, based on "additional attention" to United States Supreme Court precedent, including the intervening decision of Rompilla v. Beard, 535 U.S. 374 (2005), as well as "[c]areful consideration" of the arguments contained in Boyd's Rule 59(e) motion, the district court granted Boyd relief on his claim that trial counsel was ineffective at the penalty phase, and ordered a remand "to the state

35

trial court with instructions to assess the mitigating evidence that Boyd's attorneys attempted to present at the Rule 32 hearing, and thereafter to conduct a proper, constitutional, evaluation of all mitigating factors adduced at trial and at the Rule 32 hearing, in their entirety, before re-weighing all of such evidence against the aggravating factors found in Boyd's case." Doc. 48 at 59 (emphasis omitted).

The State filed a timely appeal concerning that portion of the district court's order granting relief on the penalty phase ineffectiveness claim. On June 16, 2009, after the district court denied the State's motion to stay the judgment pending the State's appeal, this Court entered a stay. Order, Boyd v. Allen, No. 07-14908 (11th Cir. June 16, 2009).

Boyd also filed a notice of appeal to this Court on a number of the issues rejected by the district court. Boyd moved for a certificate of appealability, which the district court granted concerning the following issues:

> I. Whether the extraneous evidence uttered in the jury room by alternate juror Edward Williams entitled Boyd to a full hearing and habeas relief;
>
> II. Whether Boyd was denied effective assistance of counsel during the guilt phase of trial, and;
>
> III. Whether the state courts' disposition of Boyd's claim that his co-defendant presented false testimony on the ground of a procedural default was an "adequate" basis upon which to preclude federal review of the claim.

36

Doc. 55 at 4 (footnotes omitted).

## II. Standard of Review

Because Boyd filed his federal habeas petition after April 24, 1996, Section 2254(d) governs this proceeding. Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998). Accordingly, a federal court may grant habeas relief only where the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established law if the court arrived at a conclusion opposite to one reached by the Supreme Court on a question of law, or if the state court confronted facts that are "materially indistinguishable" from relevant Supreme Court precedent but arrived at a different result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context. Id. at 407. An application of federal law cannot be considered unreasonable merely because it is

37

incorrect or erroneous; rather, a state court decision also must be unreasonable. Id. at 410-11.

The district court's resolution of questions of law and mixed questions of law and fact is reviewed de novo, as is the district court's conclusion concerning the reasonableness of the state court's application of federal law.  LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1259 (11th Cir. 2005).

### III.  Ineffective Assistance of Counsel During the Penalty Phase

Boyd's central claim is that he received ineffective assistance of counsel during the penalty phase of his trial because his counsel failed to adequately investigate and present mitigating evidence to the sentencing jury and the trial judge.  To succeed on an ineffective-assistance-of-counsel claim, Boyd must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694; accord Knowles v. Mirzayance, 129 S. Ct. 1411, 1420, 1422 (2009); Wiggins v. Smith, 539 U.S. 510, 521-22 (2003); Williams v. Taylor, 529 U.S. 362, 390 (2000); Darden v. Wainwright, 477 U.S. 168, 184 (1986).  Notably, a court "may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be

38

satisfied." Waters v. Thomas, 46 F.3d 1506, 1510 (11th Cir. 1995) (citing Strickland, 466 U.S. at 697).

### 1. Strickland Performance

As an initial matter, we will assume, for purposes of this appeal, that the state habeas court unreasonably applied Strickland by finding that Boyd's counsel performed adequately in preparing for and presenting mitigating evidence at the penalty phase of trial. We ground this assumption on the fact that counsel hinged their preparation mainly on the undirected essay of one family member, without following up on or seeking any of the many available public records about Boyd and his family, which would have materially furthered Boyd's approach at sentencing.

As the record shows, before the penalty phase, Boyd's sister Cindy prepared, at counsel's request, a summary of Boyd's life that indicated a variety of childhood challenges -- including an absentee father, a disabled sister, an impoverished upbringing, school problems, difficulties with his mother's remarriage, a close grandfather's death, and alcoholic grandparents. However, counsel never dug deeper into any of these issues. Had counsel done so, either by asking family members or looking into social service records, relevant mitigating evidence -- about the Boyd children's destructive father, their violent stepfather, their

39

ineffective mother, and the dangers their alcoholic grandparents exposed them to -- would have come to light. Yet for no apparent reason, counsel simply failed to investigate. See Wiggins, 539 U.S. at 525 (finding counsel's failure to investigate mitigating evidence deficient where "counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless").

Evidence of abuse and other background details about Boyd would have supported the approach counsel took at sentencing -- both to "humanize" Boyd, and to demonstrate that Boyd felt "remorse." See id. at 526 (criticizing counsel for their failure to introduce details of Wiggins' history, when "counsel put on a halfhearted mitigation case"). Indeed, defense counsel Levinson expressly testified that he would have welcomed evidence for a mitigation case that Boyd grew up in a violent, abusive, or alcoholic home, but he did not investigate any of these issues.

Also consonant with this lack of investigative follow-through, Boyd's counsel failed to prepare for or present any evidence at the sentencing hearing before the trial judge that followed the jury's verdict. According to Levinson, no one was in charge of this hearing: "[W]e didn't put any evidence on at the sentencing hearing, if I remember correctly. The jury had recommended life without [parole]. . . . I think we felt that the job was essentially done." Vol.16 at

40

129-30. Levinson said that counsel did not present additional evidence because "[w]e stupidly thought that the judge would accept the jury's recommendation." Id. at 145.

On this record and under our case law, the performance of Boyd's counsel likely was deficient. We need not, however, conclusively resolve this question, because as we determine below, Boyd has failed to satisfy Strickland's prejudice prong. See Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1248 (11th Cir. 2009) ("We need not determine whether counsel's limited investigation into Windom's background and mental health constituted deficient performance under the first prong of Strickland because we conclude that, even assuming counsel performed deficiently, Windom was not prejudiced thereby."); Hall v. Head, 310 F.3d 683, 699 (11th Cir. 2002) ("[A]lthough there is evidence in the record to support the district court's finding of deficient performance, we need not and do not 'reach the performance prong of the ineffective assistance test [because we are] convinced that the prejudice prong cannot be satisfied.' Indeed, in order for Hall to obtain habeas relief under Strickland, he must establish not only that counsel's performance was deficient, but also that counsel's errors 'actually had an adverse effect on the defense.'" (quoting Strickland, 466 U.S. at 693)).

2.    **Strickland Prejudice**

41

To show prejudice,

> it must be established that, but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different. See Strickland, 466 U.S. at 694 . . . . "It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding . . . ," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693 . . . . Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693 . . . . Rather, where, as here, a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695 . . . .

Putman v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001); see also Ferguson v. Sec'y for Dep't of Corr., 580 F.3d 1183, 1198-99 (11th Cir. 2009) (noting that Strickland asks if a different result is "reasonably probable," not if it is "possible"). Thus, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534 (emphasis added). In so doing, we presume a reasonable sentencer. See Williams v. Allen, 542 F.3d 1326, 1342 (11th Cir. 2008) (citing Strickland, 466 U.S. at 695 ("[T]he idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency[,] . . . are irrelevant to the prejudice inquiry.")).

We begin our analysis accepting Boyd's claim -- and the State's concession -- that the state habeas courts unreasonably applied Strickland by resting their

42

conclusions on the purported absence of a "causal relationship" between Boyd's mitigating evidence and the aggravating evidence in assessing prejudice. See Williams, 542 F.3d at 1343-44 (concluding that, based on the state habeas court's statement that "[t]he evidence regarding Williams' background was never found to have a causal relationship with Williams committing capital murder," the court unreasonably applied Strickland by emphasizing "the absence of a 'causal relationship' between Williams' mitigating evidence and the statutory aggravator").[4]

As a result, in our analysis, we are obliged to weigh de novo the aggravating circumstances against the totality of mitigating evidence that Boyd introduced at his original sentencing hearing and in his post-conviction proceedings. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."). After conducting this de novo review, however, we are constrained to conclude, as the Supreme

---

[4] In Callahan v. Campbell, 427 F.3d 897, 937 n.28 (11th Cir. 2005), we held that the state habeas court's reliance on causation in its prejudice inquiry was not "contrary to" Strickland, since "we review the state court's decision and not necessarily its rationale." Id. (citing Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 785 (11th Cir. 2003). Notably, however, the Callahan Court did not address whether it might be an "unreasonable application," as Boyd argues, and which Williams v. Allen binds us to conclude.

Court did in <u>Strickland</u>, that "[g]iven the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." 466 U.S. at 700.

Indeed, the aggravating circumstances in this case are especially powerful. After hearing the testimony surrounding this particularly brutal double homicide, the trial judge explained his override of the jury's recommendation of life in these terms:

> The Capital offenses were especially heinous, atrocious, or cruel when compared to other Capital offenses. The Court reaches the conclusion that this aggravating circumstance exists based upon the interpretation of the aggravating circumstances as made by the Alabama Court of Criminal Appeals and the Supreme Court of Alabama in defining heinous, atrocious or cruel, and evidence of the following:
>
> (a) Th[e] Defendant invaded the privacy of the victims, threatened to kill their daughter (and step-daughter), robbed them, kidnaped them at gun point from their home, bound and gagged them, took them to a remote area and abused both of them while they were fighting and begging for their lives.
>
> (b) The Defendant inflicted severe pain and suffering upon both victims by hitting them on the head and in the face with a large limb while they were tied up and blindfolded.
>
> (c) The Defendant shot each victim two or three times after physically abusing them.
>
> (d) The Defendant used an ax to cut Evelyn Blackmon so that her body would go into a 55 gallon drum.

44

(e) The Defendant bragged about the killings and about how cold blooded he was.

By any standard acceptable to a civilized society, these crimes were extremely wicked and shockingly evil. They were perpetrated with a design to inflict a high degree of pain with utter indifference to the suffering of the victims. The Court recognizes that all Capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness and cruelty in these offenses far exceeds that which is common to all Capital offenses.

. . .

The Court finds that the jury in this case was not emotionally influenced with passion, prejudice or other arbitrary factors in arriving at its findings of guilty as to the Capital offenses. As to the recommendation of punishment of life without parole, the Defendant, his sister and his mother made highly emotional pleas against the death penalty, the State presented no testimony in the sentence recommendation hearing. The Court further finds that if the jury was emotionally influenced with passion as a result of this testimony, it was all in favor of the Defendant as was evident from the jury's advisory verdict of life without parole.

After due consideration of all the matters that were presented to the Court during this hearing, both in mitigation and aggravation, the Court has carefully weighed the aggravating and mitigating circumstances which it finds to exist in this case, and has given consideration to the recommendation of the jury contained in its advisory verdict, and has taken into consideration all other matters that are properly before the Court, including the pre-sentence report and the arguments of the State and the Defendant. While the mitigating circumstances and the jury's recommendation of life without parole have weighed heav[il]y in the Court's consideration, this Court does now find, and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances of this horrible, cold-blooded crime as shown and brought before the Court far outweigh the mitigating circumstances shown to the Court, and

45

that said aggravating circumstances outweigh the said mitigating circumstances in all regards and that they are sufficient in both quantity and quality to more than uphold a sentence of DEATH in this case.

Boyd, 542 So. 2d at 1267-70 (appendix).

These findings are amply supported by the trial testimony. As we have already graphically detailed, the testimony revealed that Milstead and Boyd planned the robbery, based solely on Boyd's acquaintance with Mrs. Blackmon's daughter, Julie, whom Mrs. Blackmon had forbade Boyd from dating. In order to subdue the couple, Boyd and Milstead armed themselves with loaded pistols, gained entry into the Blackmon home, gagged and blindfolded Mrs. Blackmon, separated the couple, and threatened them with Julie's life, asserting that she had been kidnaped for ransom. Without any resistance, Mr. Blackmon met Boyd's monetary demands, taking $5,000 out of the bank, but the crime spree did not end there.

Boyd and Milstead instead decided to drive the Blackmons to a secluded area, where Boyd took Evelyn Blackmon into the woods and again gagged and blindfolded her. At that point, Boyd hit Mrs. Blackmon with a stick across her forehead and nose, tried to strangle her, and ultimately shot her three times, while she screamed and struggled to stay alive. Boyd and Milstead returned to Fred Blackmon, who had been left in the car only to imagine what horror had befallen

46

his wife. Boyd then had Milstead drive them to a different location, rebuffed Mr. Blackmon's attempt to barter for his life, assaulted him, and shot him twice. This extended period of terror for the Blackmons began around 8:30 a.m., when Boyd and Milstead arrived armed at the Blackmons' house; it did not end until the Blackmons' deaths sometime before 2:00 p.m., when Boyd picked up his girlfriend from work.

That evening, Boyd and Milstead returned to the woods, stuffed Mr. Blackmon's body into the trunk of his car and rolled the car into the river. Later Boyd hacked and broke Mrs. Blackmon's body with an ax in order to stuff her into a metal barrel and rolled the barrel into the river too -- presumably, dumping both bodies so that they would never be found, and there would never be any closure for the victims' family. To cap off the extended brutality of these crimes, Boyd went so far as to brag about the murders, commenting to a friend how "coldblooded" he was, and joking that the Blackmons might be "at the bottom of the river."

Quite simply, the trial testimony detailed a premeditated, heartless, senseless, and gruesome crime -- first involving kidnaping, then robbery, then torture, and finally two particularly gruesome murders, over many hours of terror -- resulting in the highly aggravated circumstances the trial judge found.[5] With

---

[5] Boyd claims that the trial court's findings relied on the testimony of his accomplice, Robert Milstead, who perjured himself. However, as we discuss below, Boyd admitted to much

47

crimes like this one, that are "carefully planned, or accompanied by torture, rape or kidnapping," we have often held "that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) (citations omitted); see also Clisby v. Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994).

Against these heinous crimes, we are obliged to consider the circumstances of Boyd's childhood, as developed at his trial and the post-conviction Rule 32 hearing. Through the testimony of Boyd's sister Cindy and social worker Jan Vogelsang, Boyd established how he and his sisters had been abandoned by an alcoholic, violent father, beaten by an assaultive stepfather, raised by an ineffective mother in an impoverished environment, and looked after by alcoholic, if loving, grandparents.

In evaluating the impact of this evidence, however, we are forced to acknowledge that the mitigating evidence introduced at Boyd's post-conviction hearing was in some measure cumulative of the evidence presented at his original trial. Thus, for instance, while the sentencing judge and the jury did not expressly learn about the violent behavior of the Boyd children's father, Cindy's trial

---

of the narrative himself; some of the findings relied on the testimony of witnesses Johnson and Surrett; and to the extent the trial judge relied solely on Milstead's testimony, the trial judge was free to believe Milstead after he had been vigorously cross-examined by Boyd's trial counsel.

testimony did reveal that their absentee father was a criminal who embarrassed the family, and that Boyd's relationship with his father was on bad terms and with ill feelings, leading Boyd to feel hurt and lonely. Likewise, while the sentencing judge and jury did not hear stories resulting from the grandparents' alcoholism, Cindy did explain at trial how the family had lived with their grandparents off and on, how close Boyd had been with his grandfather, how both grandparents had serious drinking problems, which had a "big effect" on Boyd, and how their grandfather's death "took a terrible toll" on Boyd. And while the sentencing judge and jury did not learn that rats and snakes were observed in Boyd's home, Cindy did in fact tell the jury and the trial judge that the children had grown up in a financially-strapped, impoverished, and "very emotional and unstable" environment. What's more, the post-conviction record on the state of the Boyd household is mixed. While Vogelsang offered that rats and snakes were seen in the house, social services records indicated that the home was in good condition on several occasions -- even during a surprise visit.

Cindy also detailed at trial how their sister Susie had epilepsy and was mentally slow and occasionally violent to the point of being physically restrained, which caused Boyd a great deal of confusion, and how Boyd had serious problems at school. Moreover, the sentencing judge unambiguously said that he had heard

49

the "highly emotional testimony" offered by Cindy and Boyd's mother at the trial and "carefully weighed the . . . mitigating circumstances" in making his decision.

Thus, much (although not all) of the "new" testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial and incorporated into the sentencing judge's decision to override the jury. See Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1308 (11th Cir. 2005) ("There is no reason to believe that added details about Marquard's troubled childhood and substance abuse -- which the sentencing court clearly recognized in imposing a death sentence -- would have had any effect on the sentence."); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's 3.850 counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); Grayson v. Thompson, 257 F.3d 1194, 1227-28 (11th Cir. 2001) ("Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that

the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history.").

We recognize, however, that there is one piece of evidence in the post-conviction record that is "new": that Boyd's stepfather physically abused Boyd and members of his family for years. At the original hearing, Cindy testified only that Boyd had not gotten along with his "strict, demanding" stepfather, and that the "tension between [Boyd and Oliver] became more than they could handle" until Boyd was fifteen years old, and "moved away from [Oliver] completely." Cindy did not disclose Oliver's physical violence towards Boyd, his sisters, and his mother -- testimony that undeniably would have been relevant to Boyd's mitigation case.

There are, nonetheless, several considerations leading us to believe that the evidence of abuse would not ultimately have affected weighing the aggravators and the mitigators. For starters, the record of Oliver's abuse towards Boyd himself is somewhat unclear, suggesting that most of the violence was directed at Boyd's sisters. In fact, Cindy testified that Oliver "wasn't as quick and easy to beat [Boyd] as he was myself and [Susie]." The record is also somewhat contradictory. Vogelsang testified that Oliver frequently hit Boyd on the head with a rifle butt when they went hunting, but Dr. Kirkland referenced only one occasion in which

51

Oliver hit Boyd on the head with a rifle butt. And although Cindy said that Oliver probably beat Boyd about once a week, violence towards Boyd was not documented in <u>any</u> of the many social service records produced, and there is no suggestion in the record that Boyd was ever hospitalized or suffered any brain damage or other permanent injuries as a result of any abuse.

Moreover, while we do not seek to minimize the adversities Boyd has faced, the record, including the evidence introduced at his post-conviction hearing, does not reveal the kind of abuse or deprivation inherent in other cases where <u>Strickland</u> prejudice actually has been found. Thus, for example, in <u>Wiggins</u>, the medical, school, and social services records presented at the post-conviction proceedings revealed that the defendant suffered severe physical and sexual abuse at the hands of his alcoholic mother and various foster parents throughout his childhood, teenage years, and even into early adulthood. 539 U.S. at 516. Wiggins' mother, a "chronic alcoholic," frequently left Wiggins and his siblings home alone for days at a time, which forced them to "beg for food and to eat paint chips and garbage." <u>Id.</u> The mother routinely beat the children for breaking into the kitchen, which she often kept locked. <u>Id.</u> Wiggins's mother had sex with men while her children slept in the same bed. <u>Id.</u> And on one occasion, notably, Wiggins' mother forced the petitioner's hand against a hot stove burner, which resulted in an injury that

52

required hospitalization. Id. Moreover, at the age of six, Wiggins was placed in foster care where he was physically abused by his first and second foster mothers, and his second foster father repeatedly molested and raped him. Id. To escape the abuse Wiggins ran away from a foster home at age sixteen but was returned to one where he was raped again and repeatedly by the foster mother's sons. Id. After leaving the foster care system, Wiggins entered a Job Corps program where he once again was sexually abused, this time by his supervisor. Id.

In Williams v. Taylor, juvenile records presented at the post-conviction proceedings indicated that the petitioner's home had excrement and urine on the floor; "[t]he children were all dirty and none of them had on under-pants"; the parents were intoxicated; and at one point "[t]he children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." 529 U.S. at 395 n.19 (quoting the record). In addition, social services records revealed that Williams' parents were "imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." Id. at 395 (footnote omitted). There

53

also was evidence that Williams was borderline mentally retarded, had suffered repeated head injuries, and "might have mental impairments organic in origin." Id. at 370-71.

In contrast, the record here does not contain these kinds of circumstances. There is no evidence that Boyd was ever sexually abused or raped by any parental figures, or by anyone else. Nor were Boyd's parents and stepfather imprisoned for neglect, and although the family participated in extensive social service programs, the children were never placed in foster care. There is also no evidence to suggest that Boyd's father was ever directly violent towards him, and it is unclear how much of his stepfather's violence was directed at Boyd himself.

Furthermore, based on the testimony and social service records presented, the evidence is mixed on the impoverished conditions found in Boyd's home, and showed that Boyd had some family that loved him and cared for him. And even though evidence of good character was introduced, see Vol.18, at 111-13 (classmate's testimony that Boyd was "sweet," "real quiet," and "always nice," unlike the other boys in the neighborhood); Vol.20, at 527, 535 (testimony of State's expert that Boyd was thought of in prison, including by authorities, as trustworthy, straightforward, and sincere), evidence was also introduced that he did not take advantage of some of the opportunities that had been given to him.

As for his mental health, Boyd's experts testified that other than being emotionally constricted and "possibly" learning disabled, Boyd did not exhibit any evidence of organic brain damage, delusional beliefs, or any mental illness at all. Nor is there any evidence of mental retardation. Indeed, the experts all agreed that Boyd had average to above-average intelligence and never had abused alcohol or drugs.

In short, using Williams and Wiggins as mere guideposts in our analysis, we conclude that Boyd's background -- though undeniably sad -- does not rise to the level at which prejudice has been found. See, e.g., Grayson, 257 F.3d at 1209, 1230 n.20 (noting that "the mitigating evidence available in [Williams] was far more compelling than the evidence presented on behalf of Grayson in his state habeas proceedings" that, among other things, his family life had been "violent and chaotic"); Windom, 578 F.3d at 1251 (holding that a brain-damaged and mentally ill petitioner who had suffered a difficult and impoverished upbringing, during which he was physically abused by his father and bullied by his classmates, did not compare to the "'powerful mitigating narrative' told by the gruesome circumstances of Wiggins' background").

In addition, none of the evidence presented by Boyd at the state habeas hearing establishes any additional statutory mitigating circumstances in his favor.

55

See Ala. Code § 13A-5-51.[6]  Nor does the additional mitigating evidence alter the two powerful statutory aggravators that were found by the trial court -- that (1) the capital offense had been committed during a robbery and kidnaping, see Ala. Code § 13A-5-49(4); and (2) the capital offense was especially heinous, atrocious or cruel when compared to other capital offenses, see id. § 13A-5-49(8).  See Grayson, 257 F.3d at 1226-27 ("[N]one of the evidence developed in connection with the state habeas proceedings served to alter in any way the aggravating circumstance of a heinous and atrocious crime that supported the imposition of the death penalty in this case.").

And, in fact, some of the additional mitigating evidence may have been harmful and tipped the scales still further in favor of the death penalty.  To begin with, there was testimony that Boyd was taken in by his great uncle, who owned an automobile parts store in New Mexico, but that Boyd was sent home after it was

---

[6] Under Alabama law, the statutory mitigating circumstances are: (1) the defendant has no significant history of prior criminal activity; (2) the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) the victim was a participant in the defendant's conduct or consented to it; (4) the defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor; (5) the defendant acted under extreme duress or under the substantial domination of another person; (6) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (7) the age of the defendant at the time of the crime.  Ala. Code § 13A-5-51.  At his original sentencing hearing, the trial judge found one statutory mitigating circumstance: Boyd was 20 years old on the date of the offense.  Id. § 13A-5-51(7).

discovered that he was stealing money. See Robinson, 300 F.3d at 1350 (noting that additional mitigating evidence would have allowed evidence of another crime to be admitted); Marquard, 429 F.3d at 1309 (same). Further, the additional mitigating evidence emphasizing physical abuse, neglect, and poverty would have highlighted that Boyd's sister Cindy grew up in the same environment, had probably been beaten more frequently, and still emerged as a successfully employed, law-abiding citizen. Callahan, 427 F.3d at 937 (noting social worker's concession that none of Callahan's siblings had committed violent crimes, which "further reduc[ed] the value of abuse as mitigating evidence"); Grayson, 257 F.3d at 1227 ("The fact that Grayson was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation."). In other words, even the full mitigating record in this case has its limitations.

At the end of the day, we are required to "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. And in doing so, we recognize that in brutal torture-murder cases like this one, this Court generally has not found Strickland prejudice, even where the petitioner's counsel may have performed deficiently by failing to uncover and present evidence of troubled and abusive childhoods. In Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986), for example, Thompson and a co-defendant had

57

pled guilty to the torture-murder of a woman at a motel after she failed to supply them with sufficient money. Id. at 1448-49. We found Thompson's trial counsel to have been ineffective during his capital sentencing phase because they had failed to investigate the background of the co-defendant -- who "was involved with violent motorcycle gangs, had been convicted of intimidating a government witness, and at age fourteen had killed a playmate" -- as well as Thompson's background and mental health, which would have uncovered that Thompson had a "troubled" childhood, was "mildly retarded," had "poor motor skills," and was "hyperactive . . . and difficult." Id. at 1453. Nonetheless, we concluded that even had this evidence been presented at sentencing, "we are confident that Thompson's sentence would have been the same," since the sentence "was strongly supported by the aggravating circumstances introduced in the record." Id.; see also Grayson, 257 F.3d at 1209, 1229-30 (finding that failure to present additional mitigating evidence of a "violent and chaotic" childhood and rampant alcoholism in his family did not prejudice defendant convicted of the torture-murder of 86-year-old woman for money); Francis v. Dugger, 908 F.2d 696, 702-04 (11th Cir. 1990) (finding that failure to present additional mitigating evidence of an "impoverished, abused, and socio-economically limited childhood, and . . . of his brain

58

dysfunction, diagnosed by his expert as fetal alcohol syndrome," did not prejudice defendant convicted of torture-murder of government informant).

This calculus is especially true here. As this record has amply established, and as the sentencing judge plainly found, Boyd committed an "extremely wicked and shockingly evil [crime] . . . perpetrated with a design to inflict a high degree of pain with utter indifference to the suffering of the victims[, and with a] degree of heinousness and cruelty [that] far exceeds that which is common to all Capital offenses." See Boyd, 542 So. 2d at 1268; cf. Bobby v. Van Hook, 130 S. Ct. 13, 20 (2009) (noting that federal courts should not focus on the "number of aggravating factors," but rather, "their weight"). Notably, the "new" mitigating evidence -- as compared with the evidence considered by the sentencing judge at Boyd's original trial -- is somewhat limited. In addition, the entirety of mitigating evidence -- which indicated that more of the violence in the house was directed at Boyd's sisters, that there were some positive influences in Boyd's life, and that Boyd was given some opportunities that he failed to take advantage of -- is less compelling than the "powerful mitigating narrative" found in other cases. In short, on this record, we conclude that the totality of mitigating evidence here pales when compared to the brutal nature and extent of the aggravating evidence.[7]

---

[7] In performing the weighing exercise, as we see it, the dissenting opinion fails entirely to grapple with the significant aggravating circumstances that exist in this case, let alone weigh

them against the totality of the mitigators, and as a result, has failed to comply with Strickland. Indeed, the dissenting opinion recognizes the existence of aggravating factors in Boyd's case only in order to point out that there were just two of them, as compared to four in Porter v. McCollum, 558 U.S. __, 130 S. Ct. 447 (2009). However, the Supreme Court has expressly cautioned against comparing aggravating circumstances based on their sheer number, but rather, has suggested that we focus on their weight. See Bobby, 130 S. Ct. at 20. And in fact, the aggravating circumstances in Porter were so much less severe than those found here that the Florida Supreme Court had actually stricken the "heinous, atrocious, or cruel" aggravating factor in Porter's case on the ground that the State had not carried its burden on that factor because the "record is consistent with the hypothesis that Porter's was a crime of passion, not a crime that was meant to be deliberately and extraordinarily painful." Porter, 130 S. Ct. at 449. In sharp contrast, in this case, there is no dispute that Boyd kidnaped, assaulted, and murdered the Blackmons in an unusually "heinous, atrocious, or cruel" manner (a particularly powerful aggravator), and that he did so with painful deliberation.

For this reason and others, this case is easily distinguishable from Porter. Not only are the aggravating circumstances different, but the "new" mitigating evidence introduced during Porter's post-conviction proceedings was far stronger than that found here. As the Supreme Court noted, "evidence presented during Porter's penalty hearing . . . left the jury knowing hardly anything about him other than the facts of his crimes." Porter, 130 S. Ct. at 449. At the post-conviction proceedings, the new evidence described: (1) his heroic military service in "two of the most critical -- and horrific -- battles of the Korean War," the trauma he suffered because of it, and "his struggles to regain normality upon his return from war"; (2) his abusive childhood, during which "Porter was his father's favorite target" of violence; (3) his long-term substance abuse; and (4) his impaired mental health and mental capacity, which included "brain damage that could manifest in impulsive, violent behavior." Id. at 449-54. Notably, the Supreme Court also specifically observed that "evidence of Porter's abusive childhood . . . may have particular salience for a jury evaluating Porter's behavior" in this crime of passion against his ex-girlfriend. Id. at 455. Moreover, the Court stressed the significance of Porter's military service, since "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did." Id.

Here, however, the sentencing judge and jury heard far more about Boyd during Cindy's lengthy testimony than just the facts of the crimes. In addition, it is clear that Boyd was not his stepfather's favorite target of abuse, nor, more significantly, has it been suggested that he committed a crime of passion for which his childhood abuse would have been "particular[ly] salien[t]." It is also undisputed that Boyd had not suffered from any brain damage or mental illness, and nothing in the record suggested that Boyd ever served in the military, much less during "the most critical -- and horrific -- battles of the Korean War," or would have been entitled to any leniency from that service.

We further note that Boyd's case is also easily distinguishable from the relevant cases relied on by the district court. As we have detailed at some length, the records of mitigating

60

In reaching our decision, we realize that the jury recommended a life sentence for Boyd, and that prejudice "is more easily shown" in jury override cases. Harich v. Wainwright, 813 F.2d 1082, 1093 n.8 (11th Cir. 1987), adopted by en banc court, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc), overruling on other grounds recognized in Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997). However, as Boyd's sentencing judge observed, the jury's penalty phase verdict may have been influenced by the emotional testimony offered by Boyd's sister and mother, rather than by the weight of the mitigating or aggravating circumstances. As a result, it is possible that less may be inferred from the jury's recommendation. But even if we were to take the jury's seven-to-five vote at face value, Boyd still must make a showing of prejudice based both on the aggravating and mitigating evidence. And, given the overwhelming power of the aggravating

---

evidence unearthed in both Williams v. Taylor and Wiggins are far more compelling than that presented here. Moreover, in Williams, the penalty phase presentation was far briefer than what occurred at Boyd's trial, and unlike here, Williams' counsel spent the weight of his closing argument telling the jury that it was difficult to find a reason why they should spare Williams' life. 529 U.S. at 369 & n.2. Similarly, in Wiggins, after telling the jury during the opening statement that evidence would be presented documenting Wiggins' efforts to overcome the obstacles of a "difficult life" to become a "productive citizen" who had no previous convictions, trial counsel presented no such evidence. 539 U.S. at 515. Here, by contrast, Boyd's sister Cindy's testimony on Boyd's background filled seventeen pages of transcript. Further, while two statutory aggravating circumstances were found in this case, the Wiggins Court noted "the apparent absence of any aggravating factors in petitioner's background." 539 U.S. at 525.

61

evidence found here -- when compared with the totality of mitigating evidence -- Boyd has failed to do so.[8]

In light of the brutal nature of these crimes and the specific findings made by the trial court that sentenced Boyd to death, we find no reasonable probability that the mitigating circumstances gathered and presented in connection with Boyd's state habeas proceedings would have altered the balance of aggravating and mitigating factors in this case and changed the outcome of the sentencing proceedings. Although it is always possible that evidence of Boyd's childhood could have caused a sentencing judge to impose a sentence of life rather than death, we cannot honestly find that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688. Thus, on this record, we conclude that

---

[8] The relevant jury-override cases, where we have found Strickland prejudice, are also distinguishable from Boyd's case. In Porter v. Wainright, 805 F.2d 930, 937 (11th Cir. 1986), the only mitigating evidence presented at Porter's sentencing was Porter's brief testimony, a mention by his lawyer that Porter was employed, and the impeachment of a testifying witness. Here, however, three people besides Boyd testified on his behalf. And, Boyd's sentencing judge heard some mitigating evidence, was not persuaded by it, and expressly noted that his decision to override the jury was based on the fact that the aggravating circumstances "far outweigh[ed]" the mitigating ones. Similarly, in Williams v. Allen, 542 F.3d at 1342-43, the sentencing court's impression of Williams's upbringing was incorrect in some important ways (and the trial court in fact relied on these inaccuracies in making its decision), unlike here, where the sentencing court heard a reduced, but apparently accurate summary of Boyd's sad childhood. In addition, the aggravating evidence in Williams -- of a potentially planned car robbery gone awry -- is much weaker than in Boyd's case, where two older victims were robbed, kidnaped, and emotionally and physically tortured prior to their deaths, and where the trial judge expressly found the crime to be especially heinous for purposes of a statutory aggravating circumstance.

Boyd has failed to establish <u>Strickland</u> prejudice, and in turn, has failed to establish

that he received ineffective assistance of counsel during the penalty phase of his

trial.  See <u>id.</u> at 697.  The state habeas courts properly denied relief on this

ineffective-assistance-of-counsel claim.

## IV.  Juror Misconduct

Boyd has cross-appealed on his claim that he was denied a fundamentally

fair trial and reliable sentencing proceeding in violation of the Constitution because

an alternate juror on his case, Edward Williams, was a volunteer fireman involved

in the search for the Blackmons' bodies and shared information about the search

with jury members during deliberations.  The district court reviewed Boyd's

evidentiary proffer made at the state habeas hearing concerning this claim, and

without conducting a full evidentiary hearing, concluded that the State had rebutted

the presumption of prejudice Boyd had established.  The district court thereafter

denied the claim.

Boyd now argues that the district court erred in concluding that it could

make findings of fact without hearing the evidence anew.  The State responds that

the district court's decision was correct, but also says, in the alternative, that Boyd

procedurally defaulted on this claim.  Because it is not clear from the state habeas

record whether Boyd in fact had an opportunity to prove whether the juror

misconduct claim could have been raised earlier, we agree with the district court that Boyd's claim should not be considered procedurally defaulted. But, like the district court, we conclude that this claim lacks merit.

The "decision to grant an evidentiary hearing [is] generally left to the sound discretion of district courts." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see 28 U.S.C. § 2254, R. 8(a) ("[T]he judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted."). A district court should hold a hearing if there are disputed facts concerning the petitioner's habeas claim, and the petitioner did not receive a full and fair state court hearing, either at trial or in a collateral proceeding. Townsend v. Sain, 372 U.S. 293, 313 (1963), overruled in part on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), superceded by 28 U.S.C. § 2254(e)(2); see also Schriro, 550 U.S. at 473. In other words, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro, 550 U.S. at 474. "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Id. The petitioner is not entitled to an evidentiary hearing when his

64

claims are merely "conclusory allegations unsupported by specifics." Blackledge

v. Allison, 431 U.S. 63, 74, (1977).

As we've noted, the underlying claim for which Boyd seeks an evidentiary

hearing asserts juror misconduct. As for this claim, "[a] mistrial or new trial is

required only if the extrinsic evidence known by the jury posed a reasonable

possibility of prejudice to the defendant." United States v. Ronda, 455 F.3d 1273,

1299 (11th Cir. 2006). In order to establish misconduct, "[t]he defendant has the

burden to show that the jury has been exposed to extrinsic evidence or extrinsic

contacts. Once the defendant establishes that such exposure in fact occurred,

prejudice is presumed and the burden shifts to the government to rebut the

presumption." Id.; see also McNair v. Campbell, 416 F.3d 1291, 1307 (11th Cir.

2005). The "presumption of prejudice" arises upon a showing of two elements:

that an extraneous contact with or by a member of the jury took place, and that the

contact was "about the matter pending before the jury." Remmer v. United States,

347 U.S. 227, 229 (1954).[9]

---

[9] "[O]ur sister circuits have suggested that since Remmer, the Supreme Court has abandoned, at least in part, the presumption of prejudice arising from the exposure of the jury to extrinsic evidence." Ronda, 455 F.3d at 1299 n.36. We did not ultimately resolve the issue in Ronda because "we conclude[d] that the government ha[d] sufficiently rebutted that presumption." Id. Likewise, we need not resolve the matter today.

To rebut a presumption of prejudice, the government must show that the jurors' consideration of extrinsic evidence was harmless to the defendant. Remmer, 347 U.S. at 229; Ronda, 455 F.3d at 1299; McNair, 416 F.3d at 1307-08. We consider the totality of the circumstances surrounding the introduction of the extrinsic evidence to the jury. Remmer, 347 U.S. at 229-30; Ronda, 455 F.3d at 1299-1300; McNair, 416 F.3d at 1307. These include: (1) the nature of the extrinsic evidence; (2) the manner in which the information reached the jury; (3) the factual findings in the trial court and the manner of the court's inquiry into the juror issues; and (4) the strength of the government's case. Ronda, 455 F.3d at 1300; McNair, 416 F.3d at 1307-08.

In support of this claim, Boyd presented at the state habeas hearing the affidavits of a juror and an alternate juror. See Supp.Vol.1 of 6 at 106-07 (affidavit of Edward Williams); id. at 109-110 (affidavit of Lori Boozer). The affidavit of Williams, the alternate juror, said in relevant part:

> I participated in the search with the Volunteer Fire Department. I was at the scene where they found the taillight lens and some of the chrome off the car on Dark Hollow Road. I was directing traffic, trying to keep people from coming into the scene.

Id. at 106 ¶ 4. And the affidavit of sitting juror Lori Boozer provides:

> [Mr. Williams] had been to the scene of the crime when the victims' car was taken out of the river and when the barrel was taken out of the river and had participated in the search for the victims. He was very

66

knowledgeable about the case. . . . When the testimony came in about the car and the barrel, he talked about seeing the evidence and about having seen the male victim in the back of the trunk of the car. He also had knowledge about the search for the guns. Hearing him, and putting myself in his shoes, I was thinking what if I had been there, what if I had been there, what if I had seen that, could I really have been fair sitting on the jury? This had an effect on me by making me feel like how he felt when he was there at the crime scene. I was affected by this information.

Id. at 109 ¶ 7.

Based on these affidavits, the district court found:

[A]ll information conveyed by alternate juror Williams to juror Boozer had been admitted into evidence through the testimony of several witnesses who were at the scene where Mr. Blackmon's automobile and body were recovered, photographs taken of the scene, and autopsy photographs. (R. Vols. 2-4).

The jury also heard testimony concerning Boyd's statement to the police, in which he described what had happened to each of the Blackmons in some detail, and revealed locations where evidence could be found. See R. Vol. 3, at 526-569. Boyd accompanied law enforcement to assist with the recovery of the murder weapons. Id. at 549-52.

When this court considers the totality of the circumstances surrounding the extrinsic evidence conveyed by Williams to Boozer, and perhaps other, unidentified members of the jury, it finds that the exposure did not create a reasonable probability of prejudice against Boyd. The jury was keenly aware of any information that Williams possibly could have conveyed through his observations by way of numerous eyewitnesses whose testimony from the stand corroborated one another. Finally, the evidence against Boyd was overwhelming. Based upon the foregoing, this court finds Boyd was not prejudiced by Williams's actions, and Boyd was not denied his Sixth Amendment right to trial by a fair and impartial jury.

67

Doc. 48 at 58.

Based on our independent review of the record, we cannot say that the finding by the district court -- namely, that all of the information conveyed by alternate juror Williams to juror Boozer had already been admitted into evidence -- was clearly erroneous. Indeed, the most that Boyd has shown (through Boozer's affidavit) is that Williams "talked about seeing the evidence and about having seen the male victim in the back of the trunk of the car," after the testimony came in that Mr. Blackmon's body was found in the trunk of the car and that Mrs. Blackmon's body was found stuffed in the barrel, and that he had knowledge about the search for the guns. Boozer does not offer anything more about what Williams may have told her, and Williams does not say at all what, if anything, he may have said to the other jurors, nor with whom he may have spoken. We agree with the district court that the State has rebutted all of the evidence that Boyd has submitted in order to establish a reasonable possibility of prejudice, and, has therefore shown that the jurors' consideration of extrinsic evidence was harmless to the defendant. Remmer, 347 U.S. at 229; Ronda, 455 F.3d at 1299; McNair, 416 F.3d at 1307-08.

Moreover, despite Boyd's wholly speculative suggestion that Williams may have seen more or shared more or talked to other jurors, nothing in the record supports this claim. Williams has said nothing about this in his affidavit, nor has

68

Boozer specified anything she may have learned from Williams that she did not hear at trial. Finally, to the extent that Boyd claims the state courts prevented him from developing additional facts, we remain unpersuaded -- the state court may have prevented him from introducing the facts he gathered into the record, but it did not prevent him from gathering any facts in affidavit form or otherwise from Williams or Boozer, nor, indeed, from any other juror. On this scant record, we cannot say that Boyd's allegations amount to anything more than the merely conclusory, Blackledge, 431 U.S. at 74, nor that the district court has abused its considerable discretion in failing to hold a hearing on his claim. Schriro, 550 U.S. at 473-75. Thus, we affirm the district court's decision on this matter.

## V. The State's Knowing Reliance on Perjured Testimony

Boyd has also cross-appealed on his claim that the State knew or should have known that its star witness, and Boyd's accomplice, Robert Milstead, perjured himself when he testified, rendering Boyd's conviction and ensuing sentence unconstitutional. Boyd argues that the district court erred by deeming his claim to be procedurally defaulted, and, by dismissing it on the merits without holding an evidentiary hearing. Even assuming arguendo that the claim is not procedurally defaulted, we agree with the district court that Boyd has failed to sustain his burden.

"Since its decisions in Napue [v. Illinois, 360 U.S. 264 (1959),] and Giglio [v. United States, 405 U.S. 150 (1972)], the Supreme Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Ventura v. Att'y Gen., Fla., 419 F.3d 1269, 1278 (11th Cir. 2005) (quotation and emphasis omitted). Error may occur when "the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." Id. at 1277 (quotations omitted). But if the petitioner "cannot demonstrate specific facts that, if proven, would establish the state's knowledge then there is no necessity for an evidentiary hearing." Williams v. Griswald, 743 F.2d 1533, 1542 (11th Cir. 1984).

The primary evidence Boyd submitted in support of this claim was an affidavit from Milstead, which Boyd proffered to the Rule 32 court following the evidentiary hearing. In several instances, the affidavit -- signed by Milstead about eight years after the murders -- contradicted Milstead's trial testimony. Thus, for example, Milstead had maintained at trial that Boyd alone had assaulted and shot Mrs. Blackmon, but the affidavit said that Milstead himself assaulted and initially shot Mrs. Blackmon, and that Boyd shot her in order to put her out of her misery.

70

Supp.Vol.1 of 6 at 34.  Similarly, at trial, Milstead had "made [Boyd] out to be the ringleader in the case," but in the affidavit, admitted that "that was not true [since] I was as guilty as he was."  Supp.Vol.1 of 6 at 33.

In addition, Milstead had testified at trial that as he and Boyd were dragging Mrs. Blackmon's body in preparation to dispose of it, Boyd said, "I'd like to have some of that."  R793.  But in his affidavit, Milstead claimed that "[i]t is not true that Glenn said he wanted 'a piece of that' before Evelyn died. He did not say anything of the kind."  Supp.Vol.1 of 6 at 34.  Milstead explained that this particular testimony was given based on the belief that the prosecutor wanted the testimony to be "as bad as possible for Glenn."  Id.  This, notably, is the only instance in which Milstead's affidavit attempted to link the State with Milstead's purportedly perjured trial testimony.  Otherwise, the affidavit just generally averred that Milstead "understood that [he] was expected to testify against [Boyd] to help convict him in his case and insure that he would receive the death penalty."  Supp.Vol.1 of 6 at 33.

On this record, the district court found no merit in Boyd's Napue claim, explaining its reasoning this way:

> Boyd has not suggested how the state district attorney knew or should
> have known that Milstead was committing perjury. There is nothing in
> Milstead's affidavit to indicate that he informed the prosecution that
> he intended to perjure himself at trial, or that the prosecution had any

71

reason to believe that Milstead would commit perjury. Boyd specifically draws the court's attention to Milstead's statement that he "was given the impression by the district attorney's office that [he] should make it look as bad as possible for Glenn[,]" but that statement certainly does not establish that the state district attorney instructed (or expected) Milstead to commit perjury. Thus, Boyd's claim that the prosecution knew or should have known that Milstead's trial testimony was not truthful is speculative, and would not provide the basis for habeas relief even if the claim were not barred by procedural default. See Herrera v. Collins, 506 U.S. 390, 400 . . . (1993); Brownlee v. Haley, 306 F.3d 1043, 1065 (11th Cir. 2002).

Doc. 40 at 148.

We agree. As the district court observed, Boyd has not presented anything to establish that the prosecution knew or should have known that Milstead was perjuring himself. Boyd says that there is no way he could have known since the state court did not allow him to develop the claim, and that he should be allowed an evidentiary hearing on this claim. But again, Boyd is not entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics." Blackledge, 431 U.S. at 74. Boyd has simply asserted that the prosecution "should have known" that Milstead had allegedly perjured himself, but has offered nothing to explain how or why the prosecution "should have known" that. Without any "specifics," these kind of conclusory allegations are insufficient to entitle him to a hearing on this issue. See id.; Williams, 743 F.2d at 1542.

72

Moreover, the record that Boyd has presented -- based primarily on Milstead's affidavit -- contradicts Boyd's claim that the prosecutor should have known about Milstead's purported perjury. As the district court noted, nothing in Milstead's affidavit indicates that he told the prosecution that he intended to perjure himself at trial, or that the prosecution had any reason to believe that Milstead would commit perjury. Boyd specifically has relied on Milstead's statement that he "was given the impression by the district attorney's office that [he] should make it look as bad as possible for Glenn[,]" but, as the district court found, that statement does not begin to establish that the prosecutor instructed (or even expected) Milstead to commit perjury. Rather, it suggests just the opposite -- that the prosecution did nothing to induce Milstead's alleged perjury, but, that Milstead offered the testimony on his own accord, based on his own assumptions about what the prosecutor may have wanted him to say, not on anything the prosecutor actually had told him. Because Boyd has failed to "demonstrate specific facts that, if proven, would establish the state's knowledge," Williams, 743 F.2d at 1542, the district court did not abuse its discretion in failing to hold an evidentiary hearing. Schriro, 550 U.S. at 473-74. We affirm the district court's denial of this claim too.

## VI.  Ineffective Assistance of Counsel During the Guilt Phase

73

Finally, Boyd has cross-appealed on his claim that his trial counsel failed to adequately cross-examine and otherwise impeach the credibility of key state witnesses, including Robert Milstead and the State's forensic experts, and that counsel failed to obtain the assistance of experts. This particular claim -- unlike the previous two -- was squarely presented to the state habeas court, and squarely rejected because Boyd had failed to satisfy either of the Strickland prongs. The district court likewise denied the claim, concluding that Boyd had not shown that the state habeas court's decision was contrary to or an unreasonable application of Strickland.

On this record, we agree with the district court that there is nothing to indicate that the state habeas court's decision was contrary to or an unreasonable application of Strickland. While we fail to find fault in the state court's analysis of either Strickland prong, we need address only the Strickland prejudice prong because we are "convinced that the prejudice prong cannot be satisfied." Waters, 46 F.3d at 1510. Quite simply, the record clearly supports the state habeas court's determination that there is no reasonable probability that additional cross-examination, impeachment, or expert testimony would have altered the outcome of Boyd's trial.

Boyd essentially argues that, due to counsel's ineffective treatment of the witnesses at trial, he was prejudiced because: (1) the prosecutor was able to tell the jury that Boyd fractured Mrs. Blackmon's skull pre-mortem and axed her post-mortem; (2) the pre-sentence report said Boyd was the ringleader; (3) the sentencing judge took for granted the fact that Boyd alone was responsible for shooting and assaulting both victims; and, as a result, (4) the sentencing judge found the "heinous, atrocious or cruel" aggravating factor based, in large part, on Boyd's role in striking the victims on the head, shooting each of them, and using an ax to cut Mrs. Blackmon's back and stuff her into a metal drum.

Boyd relies on the post-conviction testimony of Dr. Joseph Burton, a pathologist, and Carl Majesky, a consultant in firearms, to argue that Mrs. Blackmon's face was not assaulted pre-mortem, that the victims were not strangled, that Boyd had not assaulted Mrs. Blackmon's body with an ax nor Mr. Blackmon's head with an oak branch, and that Mrs. Blackmon died quickly as a result of gunshot wounds. Boyd also claims that, given the inconsistencies found in Milstead's statements to the police and in his trial testimony, his counsel could, and should have, dismantled Milstead's testimony.

The state habeas court made the following findings regarding Boyd's efforts at establishing prejudice:

75

Boyd contends that trial counsel failed to adequately cross-examine and otherwise to impeach the credibility of key state witnesses . . . .

We do not agree with Boyd's assertion that testimony of a pathologist would have changed the outcome of the trial. The testimony given by the State's pathologist at trial essentially corroborated Milstead's version of the injuries sustained by the victims during the incident.

. . . .

Joseph Burton testified for the defense as an expert in forensic pathology at Boyd's Rule 32 hearing. The essence of Burton's testimony was that the victims sustained injuries that caused their deaths but those injuries were not as gruesome as Milstead described. Burton also testified that the absence of blood around the victims' wounds (other than the fatal gunshot wounds) suggested that the wounds were inflicted post-mortem. The intent of this testimony was to negate a finding that the murders were especially heinous, atrocious, or cruel. However, Burton conceded that the length of time that the victims' bodies were underwater made designation of the wounds as anti- or post-mortem inconclusive. (Vol.18, R. 206.) Therefore, Burton's testimony did not discredit the testimony of the State's pathologist.

. . . .

Regarding the impeachment of Milstead, . . . [w]e agree with the State's assessment that the record from the direct appeal reflects that the jury knew that Milstead was testifying in exchange for a sentence of life imprisonment without parole and it knew that Milstead had given many different versions of the crime and had admitted that some statements he had made were not true. Boyd's allegation regarding Milstead ignores the cross-examination and the fact that the jury was informed that Milstead gave different versions of the crime and that he admitted that some of his statements to the police were untrue. These statements were entered into evidence. Trial counsel specifically attacked Milstead's credibility in closing arguments by challenging the jurors to read Milstead's various statements and to compare them

76

to Boyd's statement to determine who was telling the truth. Milstead's testimony was also impeached at trial by the testimony of Sharon Johnson, Boyd's girlfriend, who testified that Milstead told her that he had shot Mrs. Blackmon and that Boyd had shot Mr. Blackmon. Boyd v. State, 542 So. 2d 1247, 1254 (Ala.Cr.App.1988). Moreover, Milstead was cross-examined concerning the physical assaults on the victims. During closing arguments, trial counsel pointed out that forensic evidence did not support Milstead's testimony, in particular his horrible testimony about the alleged use of an ax on Mrs. Blackmon's body.

. . . .

Boyd [also] contends that trial counsel failed to seek appropriate expert assistance for the pretrial, trial, and sentencing proceedings. . . . Dr. Joseph Burton, a pathologist; Carl Majesky, a consultant in firearms; Dr. Louis Mulry Tetlow, a psychologist; and Jan Vogelsang, a social worker, testified at the Rule 32 hearing. While their testimony was intended to be favorable to Boyd, and in some aspects appears to be so on the surface, none of the testimony presented at the Rule 32 hearing from these experts conclusively supports [Boyd's] claims. . . . In the final analysis, all the testimony was either reconciled with the opinions of the State's experts or its reliability was called into question. For instance, Burton stated that the victims' bodies had stayed underwater too long to determine when specific injuries were inflicted; Majesky's qualifications were questionable and he did not know the effect of decomposition of the victims' bodies; Tetlow and Vogelsang said Boyd's actions were the result of bad decision-making on his part. Boyd has not shown that trial counsel's performance was deficient or that he was prejudiced. . . . Boyd has not shown that additional testimony would have changed the outcome of the case.

746 So. 2d at 384-88, 392.

None of the impeachment, cross-examination, or expert testimony that Boyd now relies on would have affected the claims made at trial. As for the State's

77

claim that Mrs. Blackmon's skull was fractured pre-mortem, this was amply supported at trial by two State witnesses. Dr. Joseph Embry, a forensic pathologist with the Department of Forensic Sciences, testified that while he "could not be sure" that the "numerous fractures" to Mrs. Blackmon's nose and face had occurred anti-mortem, "[t]here was hemorrhage in the wound above her eyebrow," leading him to "feel confident that [the wounds] occurred before she died." R439. In addition, Boyd's friend Kenny Surrett testified at trial that "[Boyd] said that Robert [Milstead] hit Evelyn like in the nose and drove her nose back up into her head and that Robert shot her a couple of times in the face and the head." R741-742. While Dr. Burton attempted to refute this claim at the Rule 32 hearing, he admitted that because her body had been recovered only after being in the water for weeks, the nasal lacerations he would have expected from a pre-mortem strike may not have been apparent. Any argument Dr. Burton could have made, therefore, would not have been significant to Boyd's case. See Windom, 578 F.3d at 1249 (Because "Drs. Pincus' and Beaver's opinions were inconsistent with portions of the record evidence, lacked a medically verifiable foundation, . . . and were largely controverted by Dr. Merin's testimony that Windom was not suffering from any mental impairment when he committed the murders[, i]t would . . . strain reason to conclude that the doctors' testimony would have had much impact on the

78

judge's choice of sentence." (citing Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1157 (11th Cir. 2009) (petitioner not prejudiced by counsel's failure to investigate petitioner's alleged mental health impairment where there was contrary evidence presented by the experts)).

As for Milstead's testimony that Boyd hit Mrs. Blackmon's nose pre-mortem and axed Mrs. Blackmon's body post-mortem, tried to strangle Mrs. Blackmon, was the ringleader, and alone shot and assaulted both victims, this testimony was vigorously challenged at trial, most notably, through numerous attacks on Milstead's credibility. First, Milstead was cross-examined by Boyd's counsel about the different versions of the crime he had described in his police statements. All of Milstead's statements were entered into evidence at trial, so the jury was able to determine for itself how the statements were different. Indeed, Milstead even admitted that some of his statements were not true. And, during the closing argument, Boyd's trial counsel stressed Milstead's inconsistencies:

> Milstead, who has given four or five different versions of what happened, all the way from nothing to gangsters from the mafia in white suits made him do it. Don't believe me. You look at those statements he made to the police. You'll have them in the jury room. Read them. Take time to read them. Read his and compare them to Glenn's statement, and then you decide who's telling the truth.

R895.

Trial counsel also challenged Milstead's trial testimony by presenting the testimony of Sharon Johnson. Johnson, Boyd's girlfriend, said at trial that Milstead told her that he shot Mrs. Blackmon and Boyd shot Mr. Blackmon. Boyd, 542 So. 2d at 1254. Milstead was thereafter cross-examined about Sharon Johnson's allegations that he shot Mrs. Blackmon.

Milstead was further cross-examined concerning his testimony about the physical assaults on the Blackmons. In particular, Milstead was thoroughly questioned about his testimony that Boyd used an ax to break Mrs. Blackmon's body. Moreover, during closing argument, Boyd's counsel told the jury that the forensic evidence did not support some of Milstead's testimony:

> Even from the stand yesterday, Milstead continued to tell a story that was unbelievable. He's had all these months to get his story down. Glenn's statement to you was made the day he was arrested. He said Glenn tried to choke Evelyn. Did you hear any expert testify to anything that showed any attempt to strangle anyone? He said Glenn tried to strangle Fred. Did you hear any testimony from these people who examined those bodies as to any evidence of strangulation or an attempt to do it? He said Glenn was the one who picked up the axe and tried to chop Evelyn Blackmon in two in the back, hit her eight or nine times. He said he made a comment that the axe was too dull. In the first place, that seems ridiculous that the axe wouldn't do it. But what evidence came from the experts concerning any wounds caused by an axe? Do you remember? One cut caused when they put a hole in the barrel after she was in it, not a series of eight or nine whacks with an axe across her back.

R895-96.

80

Milstead also admitted on the stand that he had pleaded guilty to capital murder and testified for the State against Boyd, in exchange for a sentence of life without parole. Furthermore, the jury was instructed that it was to determine the facts based on the evidence presented at trial.

Not only was Milstead's credibility abundantly attacked during the trial, but Boyd's post-conviction attempts to further disparage Milstead's testimony might well have fallen flat. For example, the qualifications of Majesky, the firearms expert that Boyd hoped could establish that Mrs. Blackmon died quickly, were questionable. As the record shows, Majesky only graduated from high school and had not attended college and was not a member of any scientific or forensic organizations. Moreover, while Boyd sought to use Dr. Burton's testimony in order to challenge Milstead's claim that Boyd had "tried to strangle" Mrs. Blackmon, the autopsy report failed to support this claim, which Boyd's counsel had already pointed out during closing argument. Thus, the expert testimony Boyd has now proffered would not have affected his attacks on Milstead's credibility.

In any event, the jury and the trial judge did not necessarily rely just on Milstead's testimony in finding Boyd guilty, nor in imposing sentence. In fact, Boyd admitted to much of the narrative relied upon, including his admissions to the police that he and Milstead had premeditated the robbery of the Blackmons;

that Boyd had escorted Mr. Blackmon to the bank to withdraw money, leaving Mrs. Blackmon alone at the house with Milstead, and had robbed $5,000 from Mr. Blackmon; that Boyd and Milstead had forced the Blackmons into Mr. Blackmon's Cadillac Eldorado and driven them to a secluded area by the river; that Mr. Blackmon had tried to barter for his life; and that Boyd himself had assaulted Mr. Blackmon. Moreover, some of the sentencing judge's findings relied on the testimony of witnesses other than Milstead, such as Johnson's testimony that Boyd had shot Mr. Blackmon, as well as Surrett's testimony that Boyd had told him that Boyd had assaulted and shot Mr. Blackmon as well; that Boyd had bragged about the killings; that Mr. Blackmon had begged for his life; and that Boyd and Milstead had chopped up Mrs. Blackmon in order to be able to stuff her body in the barrel.

Additionally, to the extent the trial judge or the jury relied solely on Milstead's testimony, Milstead was vigorously cross-examined by Boyd's trial counsel, and the jury and judge were free to believe Milstead. See, e.g., United States v. Prince, 883 F.2d 953, 959 n.3 (11th Cir. 1989) (noting that a fact-finder is "free to believe or disbelieve any part or all of the testimony of a witness"); see also United States v. Copeland, 20 F.3d 412, 413 (11th Cir. 1994) ("The credibility of a witness is in the province of the factfinder and this court will not ordinarily review the factfinder's determination of credibility.").

In short, we cannot see how the state habeas court's conclusion -- that Boyd has not established a reasonable probability that the deficiencies, if any, of his trial counsel altered the outcome of either phase of his trial -- was contrary to or an unreasonable application of Strickland.  The state habeas court correctly concluded that none of the impeachment, cross-examination, or expert testimony that Boyd now relies on would have affected the claims the State made at trial.  Accordingly, the state habeas court's decision must stand, and we therefore affirm the district court's denial of this claim.

## VII.  Conclusion

For the foregoing reasons, we REVERSE the district court's decision granting Boyd habeas relief on his penalty phase ineffective-assistance-of-counsel claim, and AFFIRM the district court's denial of Boyd's juror misconduct, perjured testimony, and guilt phase ineffective-assistance-of-counsel claims. Accordingly, Boyd's Petition for Writ of Habeas Corpus must be and is denied, and we REMAND the case with instructions that the district court reinstate Boyd's original sentence.

**AFFIRMED in part, REVERSED in part, and REMANDED with instructions.**

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion except for its conclusion that counsel's failure to investigate and present at sentencing the horrific details of Boyd's background did not prejudice Boyd under Strickland. To demonstrate prejudice resulting from ineffective assistance of counsel,

> a petitioner need not show that counsel's deficient performance more likely than not altered the outcome of the case . . . . Rather, where, as here, a petitioner challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Putnam v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001) (citing Strickland v. Washington, 466 U.S. 668, 693-695 (1984)). Importantly, this court has held that in a jury override case, prejudice is "more easily shown." Harich v. Wainwright, 813 F.2d 1082, 1093 n.8 (11th Cir. 1987), adopted by en banc court, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc), overruling on other grounds recognized in Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997). On this record, where the trial judge overrode the jury's recommendation of a life sentence, there is without question a "reasonable probability" that, had counsel presented the wealth of testimony adduced at Boyd's state habeas proceedings regarding Boyd's turbulent and abusive childhood, such evidence would have altered the balance of

84

aggravating and mitigating factors relied upon by the trial judge in overriding the jury's sentence.

In the recent case of Porter v. McCollum, 558 U.S. __, 130 S. Ct. 447, 454 (2009), the Supreme Court reversed this court's judgment that, among other things, petitioner Porter had not established prejudice under Strickland arising out of his counsel's failure to present evidence of his background to the jury or the trial court. In particular, the Court noted that neither the jury nor the trial judge had heard about:

> (1) Porter's heroic military service in two of the most critical-and horrific-battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling. See Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (" '[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable' ").

The Court next noted that "[h]ad counsel been effective, the judge and jury would have learned of the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." Id. (citation and quotation omitted). Finally, the Court concluded that "had the judge and jury been able to place Porter's life history on the mitigating side of the scale and appropriately reduced the ballast on the aggravating side of the scale [based on the Florida Supreme Court's subsequent

conclusion that the heinous, atrocious, and cruel aggravator was inappropriate],

there is clearly a reasonable probability that the advisory jury—and the sentencing

judge—would have struck a different balance." Id. At Porter's sentencing, the

trial judge had found no mitigating circumstances and three valid aggravating

circumstances—one more than in Boyd's case—including that Porter had killed in

a cold, calculated and premeditated manner, see Porter v. Att'y Gen., 552 F.3d

1260, 1262 (11th Cir. 2008).

Although the majority in this case finds that the record is "mixed" with

respect to some of the details of Boyd's childhood abuse, poverty, and neglect, the

record is clear that neither the jury nor the trial judge ever heard—and therefore

had no opportunity to evaluate or consider—any of these details.[1] As in Porter, the

trial court in Boyd's case heard nothing about (1) the severe abuse endured by

---

[1] In an effort to minimize the impact of counsel's failure to present evidence of Boyd's troubled background, the majority emphasizes that some of the evidence regarding Boyd's childhood is inconsistent. For example, the majority points out that while one expert testified that Boyd's stepfather frequently hit Boyd on the head with a rifle butt, another expert referenced only one occasion in which he did so. However, the mere fact that one expert mentioned only one rifle incident is not inconsistent with, nor does it undermine, the totality of the evidence adduced regarding the horrendous abuse inflicted upon Boyd and his sisters. Similarly, the majority notes that the abuse suffered by Boyd, estimated by his sister Cindy to have occurred about once a week, is not documented in any public records. However, I am aware of no requirement that testimony regarding abuse must be confirmed in public records before it may be weighed by a judge or jury. Moreover, as the Supreme Court recently pointed out, it is unreasonable to "discount entirely" mitigating evidence, simply because some of it might have been called into question. See Porter, 130 S. Ct. at 455 ("While the State's experts identified perceived problems with the tests that [Porter's mental health expert] used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.").

Boyd, his mother, and his sisters, including one mentally disabled sister, at the hands of their stepfather;[2] (2) the extreme poverty and neglect suffered by the children, which included rats and snakes crawling through their belongings and eating dirt for nutrients; (3) Boyd's emotionally unstable mother, who was unable to care for or protect her children and who attempted suicide when Boyd was eleven; (4) Boyd's alcoholic father destroying the house in a rage when he was home from prison, hitting his own parents, and abusing Boyd's mother; and (5) Boyd's alcoholic grandparents crawling through the house drunkenly on their knees, beating each other in front of the children, and endangering Boyd and his sisters' lives by, among other things, forcing Boyd's twelve-year-old sister to drive the family car with six-year-old Boyd in it.[3]

_____

[2] I find little relevance to the fact that much of Boyd's stepfather's abuse was directed at Boyd's sisters. Evidence of such severe abuse directed at his sisters is without a doubt relevant mitigating evidence with respect to Boyd himself. It simply strains credulity to suggest that a child is unaffected by his siblings' experiences. Cf. Porter, 130 S. Ct. at 449 (describing the abuse suffered by Porter, including that he "routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child").

[3] A fair reading of this record belies the majority's assessment that much of the new mitigation evidence introduced at the post-conviction hearing "would simply have amplified the themes already raised at trial and incorporated into the sentencing judge's decision to override the jury." That the jury learned that Boyd's grandparents were "drinkers" is a far cry from the unintroduced facts that they forced Boyd's twelve-year old sister to drive the family home from Florida to Alabama, with six year old Boyd beside her, they routinely beat each other in front of the children, crawled through the house on their knees drunkenly, or that his grandfather repeatedly set the house on fire. Nor do I agree that the jury's learning that Boyd's father was a "criminal who embarrassed the family" is "cumulative" of the unintroduced fact that Boyd's father was a violent alcoholic, who destroyed the house in a rage when he was home from prison and sometimes abused Boyd's mother and his own parents. Finally, that the jury learned Boyd grew up in an impoverished setting pales in comparison to the unintroduced facts that rats and

Had this evidence been introduced, it is reasonably probable that the sentencing judge—who found only two aggravating circumstances and also took into account as mitigating circumstances Boyd's young age and the fact that he assisted law enforcement to some extent in locating the bodies—would have implemented the jury's recommendation of life without paroled. I therefore respectfully dissent as to this issue.

---

snakes crawled through the children's belongings, that the children ate dirt when there was not enough food, and that Boyd's mother was unstable and unable to provide for her children, at one point attempting suicide when Boyd was eleven.